TYSON, Judge.
*255 Chad Cameron Copley ("Defendant") appeals from a judgment entered following a jury's conviction for first-degree murder. We vacate Defendant's conviction and judgment and grant a new trial.
I. Background
On 22 August 2016, Defendant was indicted by a grand jury for first-degree murder. Defendant's trial began on 12 February 2018.
A. State's Evidence
At trial, the State presented evidence tending to show the following: On 6 August 2016, Jalen Lewis ("Lewis") hosted a party at his parents' home, two or three houses down the street from Defendant's house. One of his guests, Chris Malone ("Malone"), and two companions, David Walker ("Walker"), and Kourey Thomas ("Thomas"), arrived at Lewis's party in Walker's car around midnight, and parked on the street. Malone was acquainted with Lewis. Walker and Thomas were not. Malone entered Lewis's house to ask permission for Walker and Thomas to *37 enter. Walker and Thomas waited outside near the front steps of the house.
Sometime between midnight and 1:00 a.m., a group of approximately twenty people arrived separately from Thomas, Walker, and Malone. Lewis and his friends did not know the group of twenty people. After about ten minutes, the group was asked to leave. The group agreed to leave, and walked toward their cars, congregating near the curb in front of Defendant's house to discuss where to go next.
Defendant, who was inside his home and in his second-story bedroom, became disturbed by the group's noise outside. Defendant called 911 and told the operator he was "locked and loaded" and going to "secure the neighborhood." Defendant also stated, "I'm going to kill him." The operator attempted to obtain more information from Defendant, but the phone call was terminated.
At the same time these events were transpiring, a law enforcement officer was conducting a traffic stop nearby, which caused the lights of his police cruiser to reflect down the street. Thomas and Walker saw *256 the lights and became worried about the presence of law enforcement because Thomas possessed a marijuana grinder on his person.
Thomas decided to leave the party after seeing the police cruiser's lights. Thomas left the party first. He ran from Lewis's house, and cut across the yard, towards Walker's car. Before he could reach the car, Thomas was shot by Defendant, who fired one shot without warning, from inside the window of his dark, enclosed garage. EMS arrived and transported Thomas to the hospital, where he died as a result of the gunshot.
Wake County Sheriff's Deputy Barry Carroll ("Deputy Carroll") was one of the first investigators to arrive upon the scene. Deputy Carroll approached Defendant's house after observing broken glass in Defendant's driveway and a broken window in the garage. He shined a light through a garage window, and saw Defendant step through a door from the house into the garage. Deputy Carroll asked Defendant if he had shot someone. Defendant admitted shooting Thomas. Deputy Carroll requested Defendant to open the front door. Defendant complied and showed Deputy Carroll the shotgun he had used to fire at Thomas.
At the close of the State's evidence, Defendant moved to dismiss the case. The trial court denied the motion.
B. Defendant's Evidence
Defendant testified and presented evidence tending to show the following: Defendant had argued with his wife on the morning of 6 August 2016, and then spent the day at home drinking, sleeping, and "just hanging out in the garage." After going to sleep that evening in his upstairs bedroom, Defendant awoke at approximately 12:30 a.m. Defendant and his wife then had marital relations. Shortly thereafter, Defendant looked out of his bedroom window and saw a group of people in front of his house. Defendant described the group as "yelling and screaming" and "revving their engines."
Irritated at the noise the group made, Defendant yelled out the window, "You guys keep it the f[**]k down; I'm trying to sleep in here." Members of the group yelled back, "Shut the f[**]k up; f[**]k you; go inside, white boy,' things of that nature." Defendant saw "firearms in the crowd[,]" and two individuals "lifted their shirts up" to flash their weapons. He testified that he called 911 at 12:50 a.m. at his wife's request.
When Defendant called 911, he thought his son and his son's friends were outside, and stated his teenaged son was the "him" he referenced he was going to "kill" while on the 911 call. After ending the call with *257 911, he retrieved his shotgun, loaded it, and walked downstairs into his attached garage.
When he discovered his son was inside the garage and not part of the group outside, he told his son to go upstairs for safety and to get a rifle. He again yelled at the group outside, instructing them to leave the premises and informing them that he was armed. Defendant claimed Thomas began running towards Defendant's house and pulled out a gun. Defendant fired one shot from his shotgun towards Thomas through the window of his garage.
At the close of Defendant's evidence, he renewed his motion to dismiss, which the *38 trial court denied. Following deliberation, the jury found Defendant guilty of first degree murder by premeditation and deliberation and by lying in wait. The trial court sentenced Defendant to life without parole. Defendant gave notice of appeal in open court.
II. Jurisdiction
Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. §§ 7A-27(b) and 15A-1444 (2017).
III. Issues
Defendant argues three issues on appeal: (1) the trial court plainly erred by instructing the jury that the defense of habitation was not available if Defendant was the aggressor; (2) the trial court erred by allowing the prosecutor to make egregious, improper, and racially-charged arguments during its closing argument; and (3) the trial court erred by instructing the jury on the theory of lying in wait.
IV. Race-based Argument
We first address Defendant's argument that the trial court erred by overruling his objections to racially-charged statements made by the prosecutor during closing arguments.
During the State's rebuttal closing argument, the prosecutor stated, over Defendant's multiple objections:
[PROSECUTOR]: And while we're at it ... I have at every turn attempted not to make this what this case is about. And at every turn, jury selection, arguments, evidence, closing argument, there's been this undercurrent, right? What's the undercurrent? The undercurrent that the defendant brought up to you in his closing argument is what did he mean by hoodlums? I never told you what *258 he meant by hoodlums. I told you he meant the people outside. They presented the evidence that [Defendant is ] scared of these black males. And let's call it what it is. Let's talk about the elephant in the room. [Emphasis supplied].
[DEFENSE COUNSEL]: Objection.
The Court: Overruled.
[PROSECUTOR]: Let's talk about the elephant in the room. If they want to go there, consider it. And is it relevant for you? Because we talked about that self-defense issue, right, and reasonable fear. What is a reasonable fear? You get to determine what's reasonable. Ask yourself if Kourey Thomas and these people outside were a bunch of young, white males walking around wearing N.C. State hats, is he laying [sic ] dead bleeding in that yard? [Emphasis supplied].
[DEFENSE COUNSEL]: Objection.
The COURT: Overruled.
[PROSECUTOR]: Think about it. I'm not saying that's why he shot him, but it might've been a factor he was considering . You can decide that for yourself. You've heard all the evidence. Is it reasonable that he's afraid of them because they're a black male outside wearing a baseball cap that happens to be red? They want to make it a gang thing. The only evidence in this case about gangs is that nobody knows if anybody was in a gang. That's the evidence. They can paint it however they want to paint it, but you all swore and raised your hand when I asked you in jury selection if you would decide this case based on the evidence that you hear in the case, and that's the evidence. Now, reasonableness and that fear, a fear based out of hatred or a fear based out of race is not a reasonable fear , I would submit to you. That's just hatred . And I'm not saying that's what it is here, but you can consider that . And if that's what you think it was, then maybe it's not a reasonable fear. [Emphasis supplied].
A. Standard of Review
The Supreme Court of North Carolina held that a defendant's objection made during closing argument should be reviewed as if the *259 defendant had objected to every instance of the challenged statements. State v. Walters , 357 N.C. 68, 104, 588 S.E.2d 344, 365, cert. denied , 540 U.S. 971, 124 S.Ct. 442, 157 L.Ed.2d 320 (2003). In Walters , the prosecutor made a closing argument comparing the defendant to Adolf Hitler. Id . The defendant's counsel objected, and the trial court overruled the objection. Id . The prosecutor *39 then continued making allusions comparing the defendant to Hitler.
Our Supreme Court reasoned:
Whereas it is customary to make objections during trial, counsel are more reluctant to make an objection during the course of closing arguments "for fear of incurring jury disfavor." Defendant should not be penalized twice (by the argument being allowed and by her proper objection being waived) because counsel does not want to incur jury disfavor. Therefore, defendant properly objected to the prosecutor's argument, and no waiver occurred by defendant's failure to object to later references to Hitler.
Id . (citation omitted).
When a defendant properly objects to closing argument, the Court must determine if "the trial court abused its discretion by failing to sustain the objection." Id . at 104, 588 S.E.2d at 366 (citation omitted). We "first determine if the remarks were improper. Next, we determine if the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court." Id . (citations and internal quotation marks omitted). Following Walters , Defendant's multiple objections at trial and arguments against the prosecutor's racial comments are preserved for appellate review. See id .
"When a court determines that an argument is improper, a defendant must prove that the statements were of such a magnitude that their inclusion prejudiced [the] defendant and that a reasonable possibility exists that a different result would have been reached had the error not occurred." State v. Dalton , 243 N.C. App. 124, 135, 776 S.E.2d 545, 553 (2015) (alteration in original) (internal quotation marks and citation omitted), aff'd , 369 N.C. 311, 794 S.E.2d 485 (2016).
B. Closing Arguments
This Court has recently decided a large number of appeals in which prosecutors made improper comments and statements during closing arguments. See, e.g., State v. Degraffenried , --- N.C. App. ----, ----, 821 S.E.2d 887, 889 (2018) (holding that prosecutor made improper *260 reference to the defendant's exercise of his right to trial by jury); State v. Phachoumphone , --- N.C. App. ----, ----, 810 S.E.2d 748, 759 (holding that prosecutor inappropriately cited witnesses' out-of-court statements as substantive evidence), review allowed , --- N.C. ----, 818 S.E.2d 111 (2018) ; State v. Madonna , --- N.C. App. ----, ----, 806 S.E.2d 356, 363 (2017) (holding that prosecutor improperly stated that the defendant had lied to the jury), review denied , 370 N.C. 696, 811 S.E.2d 161 (2018).
Our Supreme Court has stated: "The prosecuting attorney should use every honorable means to secure a conviction, but it is his duty to exercise proper restraint so as to avoid misconduct, unfair methods or overzealous partisanship which would result in taking unfair advantage of an accused." State v. Holmes , 296 N.C. 47, 50, 249 S.E.2d 380, 382 (1978) (citations omitted).
The General Rules of Practice for the Superior and District Courts provide, in relevant part: "Counsel are at all times to conduct themselves with dignity and propriety[,]" and "[t]he conduct of the lawyers before the court and with other lawyers should be characterized by candor and fairness[.]" Gen. R. Pract. Super. and Dist. Ct. 12, 2019 Ann. R. N.C. 10-12.
The Preamble to the North Carolina Revised Rules of Professional Conduct states that "A lawyer, as a member of the legal profession, is ... an officer of the legal system, and a public citizen having special responsibility for the quality of justice." Rule of Professional Conduct 3.4(e) states that "A lawyer shall not ... in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence[.]" All licensed attorneys, whether representing the State or a defendant, must be ever mindful of their oaths and duties as officers of the court and the important roles they serve in the impartial administration of justice. See id.
C. Injection of Race
Long-standing precedents of the Supreme Courts of the United States and *40 North Carolina prohibit superfluous injections of race into closing arguments. "The Constitution prohibits racially biased prosecutorial arguments." McCleskey v. Kemp , 481 U.S. 279, 309 n.30, 107 S.Ct. 1756, 1776 n.30, 95 L.Ed.2d 262, 289 n.30 (1987) (citation omitted). "[P]rosecutor[s] may not make statements calculated to engender prejudice or incite passion against the defendant. Thus, overt appeals to racial prejudice, such as the use of racial slurs, are clearly impermissible. Nor may a prosecuting attorney emphasize race, even in neutral terms, gratuitously." State v. Williams , 339 N.C. 1, 24, 452 S.E.2d 245, 259 (1994) (citations and internal quotation marks omitted), disapproved of on other grounds by *261 State v. Warren , 347 N.C. 309, 492 S.E.2d 609 (1997). Gratuitous appeals to racial prejudice "tend to degrade the administration of justice." Battle v. United States , 209 U.S. 36, 39, 28 S.Ct. 422, 424, 52 L.Ed. 670, 673 (1908).
Our Supreme Court has instructed: "Closing argument may properly be based upon the evidence and the inferences drawn from that evidence." State v. Diehl , 353 N.C. 433, 436, 545 S.E.2d 185, 187 (2001) (citing State v. Oliver , 309 N.C. 326, 357, 307 S.E.2d 304, 324 (1983) ). "Although it is improper gratuitously to interject race into a jury argument where race is otherwise irrelevant to the case being tried, argument acknowledging race as a motive or factor in a crime may be entirely appropriate." Id . (emphasis supplied) (citing State v. Moose , 310 N.C. 482, 492, 313 S.E.2d 507, 515 (1984) ).
In Moose , our Supreme Court held a white defendant's reference to a black victim as a "damn ni[**]er" along with evidence that the victim was seen driving through a white residential community, was sufficient evidence to support a prosecutor's closing argument that the victim's murder was, in part, racially motivated. 310 N.C. at 492, 313 S.E.2d at 515. Unlike the facts in Moose , no evidence presented to the jury in this case tends to suggest Defendant had a racially motivated reason for shooting Thomas.
Here, the prosecutor prefaced his final argument by acknowledging the absence of any evidence of racial bias: "I have at every turn attempted not make ... [race] what this case is about." Despite the absence of evidence, he then argued that because Defendant's race is white, he was motivated to shoot and kill Thomas because he was black.
The prosecutor asserted in his closing argument: "They presented the evidence that he's scared of these black males." Nothing in the evidence presented to the jury tends to support this assertion in the prosecutor's argument that Defendant feared or bore racial hatred towards the individuals outside of his home because they were black. The only evidence submitted to the jury regarding race was Defendant's testimony that the members of the group outside his house had told him to "go inside, white boy," after he had raised his bedroom window and shouted at them to quiet down shortly before 12:50 a.m. Race was irrelevant to Defendant's case.
In the final argument, the prosecutor noted the evidence that Defendant claimed to be fearful of the group in the yard because he thought they may be in a gang: "They want to make it a gang thing. The only evidence in this case about gangs is that nobody knows if anybody was in a gang."
*262 In its brief on appeal, the State attempts to find some evidentiary basis for the racial comments in the closing argument, but in this effort inadvertently acknowledges the complete absence of evidence regarding race. In short, the State equates gang membership to black males. The State specifically argues Defendant presented evidence that the "partygoers included suspected gang members" and "[t]heir affiliation was suspected based on their wearing gang colors, particularly red." The State includes a footnote noting "Red is worn by members of the Bloods, a primarily African American street gang . See e.g., State v. Kirby, 206 N.C. App. 446, 449, 697 S.E.2d 496, 499 (2010) ; State v. Riley, 159 N.C. App. 546, 549, 583 S.E.2d 379, 382 (2003)." (Emphasis supplied). In the Kirby and Riley cases, there was evidence that Bloods gang members wore red articles and clothing. See Kirby , 206 N.C. App. at 449, 697 S.E.2d at 499 ("Defendant also said that he felt disrespected by Dunn because he was wearing a "Scream" mask with red on it, *41 like blood, because defendant was a member of the Blood gang and Dunn was a member of the Folk gang."); Riley , 159 N.C. App. at 549, 583 S.E.2d at 382 ("Officer Smith said that "Bloods" typically wear the color red and "Crips" wear the color blue, although at times, rival gang members will wear the other gang's colors to get closer in order to commit violent acts.").
There is no mention in either Kirby or Riley that the Bloods gang is "primarily African American" and no evidence was presented in this case of the race of members of any gang. Citations to other cases does not provide evidence in this case of any association between the color red, gangs, and black males. No evidence was presented to the jury in this case the Bloods are a "primarily African American" gang, and there was no evidence that Defendant was aware of the typical racial profile of any gang. The only evidence was that Defendant, as well as the hosts of the party, suspected gang activity, and that they were fearful, was because they knew that gang members may carry guns. Their fear was based upon their knowledge of the dangers posed by guns and gangs generally; the fear was not associated with the race of the group ejected from the party.
After its argument equating gang membership and black men, the State argues in its appellee brief that the prosecutor's racially-based argument was proper because:
[T]he jury had to determine whether Defendant's fear was reasonable. Insofar as Defendant expressed a fear of gang members wearing gang colors, the prosecutor aptly inquired whether a white male would elicit the same scrutiny. As the prosecutor said, a fear based on race is *263 not a reasonable fear. The prosecutor is permitted to argue the law, and these remarks were not improper. See Diehl , 353 N.C. at 436, 545 S.E.2d at 187. [Emphasis supplied].
The State's argument insinuates Defendant could have believed the individuals outside his house were gang members because they were black. No admitted evidence suggests Defendant might have thought the individuals were gang members because of their race. The State's argument that Defendant might have inferred the individuals were gang members because of their race is offensive, invalid, and not supported by any evidence before the jury.
No logical connection exists between Defendant recounting that he was referred to as "white boy" by those individuals outside his home and the prosecutor's invidious inference that Defendant held an irrational fear or exhibited hatred of Thomas and the other black partygoers to allow this closing argument. The prosecutor's comments are a wholly gratuitous injection of race into the trial and were improper. See Williams , 339 N.C. at 24, 452 S.E.2d at 259. The prosecutor's comments are especially egregious because he made them during the State's final rebuttal argument to the jury, which left defense counsel with no opportunity to respond, other than by objecting.
The prosecutor also asserted Defendant had referred to the individuals outside his house as "hoodlums." No evidence suggests Defendant's use of the word "hoodlums" bore any racial connotation. On direct examination, Defendant testified he had used the term "hoodlum" to mean "Like a juvenile delinquent, someone that will not listen to authority or listen to their parents and just kind of takes [sic ] every day as that day and doesn't care about tomorrow. They're living in that day because that's all they care about." Defendant also described his own teen-aged son as a "hoodlum."
"Hoodlum" is defined as: "1. A gangster; a thug. 2. A tough, often aggressive or violent youth." Hoodlum, The American Heritage Dictionary of the English Language, Fifth Edition, https://ahdictionary.com/word/search.html?q=hoodlum (last visited on 4 April 2019). Nothing in either Defendant's use of the term nor the dictionary definition of "hoodlum," suggests any racial bias or animus on Defendant's part. No evidence presented at trial suggested the word "hoodlum" has a racial connotation. The prosecutor's injection of racially-based arguments were gratuitous and improper. Williams , 339 N.C. at 24, 452 S.E.2d at 259.
"Discrimination on the basis of race, odious in all aspects, is especially pernicious *42 in the administration of justice." *264 Rose v. Mitchell , 443 U.S. 545, 555, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). The United States Court of Appeals for the Fourth Circuit reviewed a case from North Carolina, which involved a prosecutor's jury argument that a white woman would never have consensual intercourse with a black man. Miller v. North Carolina , 583 F.2d 701, 707 (1978). The Court held that the prosecutor's statements denied the defendants of their constitutional right to a fair trial and stated "an appeal to racial prejudice impugns the concept of equal protection of the laws. One of the animating purposes of the equal protection clause of the fourteenth amendment, and a continuing principle of its jurisprudence, is the eradication of racial considerations from criminal proceedings." Miller v. North Carolina , 583 F.2d 701, 707 (4th Cir. 1978).
The United States Court of Appeals for the Second Circuit persuasively stated in McFarland v. Smith , 611 F.2d 414, 416-17 (2nd Cir. 1979) :
Race is an impermissible basis for any adverse governmental action in the absence of compelling justification. ... To raise the issue of race is to draw the jury's attention to a characteristic that the Constitution generally commands us to ignore. Even a reference that is not derogatory may carry impermissible connotations, or may trigger prejudiced responses in the listeners that the speaker might neither have predicted nor intended.
The prosecutor's objected-to rebuttal jury arguments served to "draw the jury's attention" to Defendant's race being white and Thomas's race being black, inject prejudice, and unjustifiably suggested the jury could or should infer Defendant is racist. See id .
D. Other Jurisdictions
Courts of other federal and state jurisdictions have also granted new trials when prosecutors had gratuitously injected race into closing arguments. See, e.g., United States v. Cannon , 88 F.3d 1495, 1503 (8th Cir. 1996) (awarding a new trial where prosecutor twice called two "African-American Defendants 'bad people' and [called] attention to the fact that the Defendants were not locals."), abrogated on other grounds by Watson v. United States , 552 U.S. 74, 128 S.Ct. 579, 169 L.Ed.2d 472 (2007) ; Tate v. State , 784 So.2d 208, 216 (Miss. 2001) (holding prosecutor's comments regarding defendant's allegedly racist sentiments were improper and prejudicial where race was irrelevant to the defendant's assault charge).
In State v. Cabrera , 700 N.W.2d 469, 473 (Minn. 2005), the Supreme Court of Minnesota reviewed a prosecutor's race-based closing argument *265 made during a first-degree murder trial. During closing argument the prosecutor stated:
Prosecutor: Now, the defense case in addition to the-in addition to just throwing mud on young black men and saying that they're-if they're young black men they must be in gangs-
Defense: Objection, Your Honor. It was never our contention to be racist in this case.
Court: Overruled. It's argument.
Id . at 474.
During the rebuttal portion of closing argument, the prosecutor also stated:
Finally, the other thing you didn't hear in the courtroom, other than counsel who apparently is an expert on gangs, you heard nothing about gangs. You heard nothing about gangs other than what came from the State's witnesses telling about their past association and some wild and, I submit, racist speculation on the part of counsel here, that because these men who happen to be black are in-have been in gangs in the past , despite their testimony about trying to get on with their lives, that they are people to be feared, they're rough characters . Well, we know what that's a code word for . He's a big, strong black man, but he's a rough character.
Members of the Jury, this is not about race.
Id . (emphasis supplied). The defense counsel also objected to this comment, which the trial court overruled. Id .
On appeal, the Supreme Court of Minnesota noted: "The defense never mentioned the race of a witness or even implied that race was a factor in this case during his examination *43 of witnesses or in closing argument." Id . The Court reasoned "the defense properly objected to the prosecutor's improper statements, but was erroneously overruled. Working in tandem, the improper argument and the court's ruling may have led the jury to conclude that defense counsel himself was racist-an implication wholly unsupported by the record." Id . at 474-75. The Court concluded "that the prosecutor's statements injecting race into closing argument were serious prosecutorial misconduct." Id . at 475. *266 The Court ultimately held that the prosecutor's misconduct warranted a new trial, despite the strong evidence of guilt, because:
Bias often surfaces indirectly or inadvertently and can be difficult to detect. We emphasize, nonetheless, that the improper injection of race can affect a juror's impartiality and must be removed from courtroom proceedings to the fullest extent possible. Affirming this conviction would undermine our strong commitment to rooting out bias, no matter how subtle, indirect, or veiled.
Id . (citation and quotation marks omitted). This reasoning of the Supreme Court of Minnesota, regarding the dangers of gratuitously injecting race into closing argument and to grant a new trial in that first-degree murder case, provides a persuasive and compelling basis for granting Defendant a new trial. See id .
E. State v. Jones
With regard to this State's precedents, Defendant cites our Supreme Court's opinion in State v. Jones , 355 N.C. 117, 558 S.E.2d 97 (2002). In Jones , the defendant was also charged with first-degree murder. Id . at 119, 558 S.E.2d at 99. The prosecutor referenced the Columbine school shooting and the Oklahoma City bombing during closing arguments and attempted to link those tragedies to the tragedy of the victim's death, even though they were wholly unrelated events. Id . at 132, 558 S.E.2d at 107.
Our Supreme Court held that this closing argument was improper because: "(1) it referred to events and circumstances outside the record; (2) by implication, it urged jurors to compare defendant's acts with the infamous acts of others; and (3) it attempted to lead jurors away from the evidence by appealing instead to their sense of passion and prejudice." Id .
Our Supreme Court held the statements were prejudicial because:
The impact of the statements in question, which conjure up images of disaster and tragedy of epic proportion, is too grave to be easily removed from the jury's consciousness, even if the trial court had attempted to do so with instructions. Moreover, the offensive nature of the remarks exceeds that of other language that has been tied to prejudicial error in the past. See, e.g., State v. Wyatt , 254 N.C. 220, 222, 118 S.E.2d 420, 421 (1961) (holding that a prosecutor who described defendants as "two of the *267 slickest confidence men" committed reversible error); State v. Tucker , 190 N.C. 708, 709, 130 S.E. 720, 720 (1925) (holding that it was prejudicial error for a prosecutor to say that the defendants "look[ed] like ... (professional) bootleggers"); State v. Davis , 45 N.C. App. 113, 114-15, 262 S.E.2d 329, 329-30 (1980) (holding that it was prejudicial for a prosecutor to call the defendant a "mean S.O.B."). As a result, we hold that the trial court abused its discretion[.]
Id . at 132-33, 558 S.E.2d at 107.
Here, no admitted evidence, including Defendant being told to "go inside, white boy," or his use of the word "hoodlum," tended to show or support any inference Defendant had shot Thomas for racially-prejudiced reasons. The prosecutor's comments improperly cast Defendant as a racist, and his comment implying race was "the elephant in the room" is a brazen and inflammatory attempt to interject race as a motive into the trial and present it for the jury's consideration. Williams , 339 N.C. at 24, 452 S.E.2d at 259.
As in Jones , the prosecutor's appeal to the jury's emotions "is too grave to be easily removed from the jury's consciousness." Id . at 132, 558 S.E.2d at 107. The offensive nature of the prosecutor's comments exceeded language that our Supreme Court in Jones *44 noted was held to be prejudicial error warranting new trials in past cases. See id .
The trial court committed prejudicial error by overruling Defendant's repeated objections and by failing to instruct the jury to disregard the prosecutor's inflammatory comments or to declare a mistrial. Defendant is entitled to a new trial. Id . at 132-33, 558 S.E.2d at 107.
F. Pattern Jury Instruction
As we have determined Defendant must receive a new trial based upon the improper injection of race into the closing argument. We need not and will not address Defendant's remaining issues, which may not arise upon remand. We note that Defendant's other issues are based upon the jury instructions, and particularly the combination of theories of self-defense, defense of habitation, initial aggressor, and lying in wait. We recognize the difficulty of crafting jury instructions in a case with this combination of issues. For guidance on remand, we point out one potential problem with the pattern jury instructions.
The trial court gave jury instructions on both self-defense and defense of habitation. The recently revised defense of habitation statute defines "home" as "A building or conveyance of any kind, to include *268 its curtilage , whether the building or conveyance is temporary or permanent, mobile or immobile, which has a roof over it, including a tent, and is designed as a temporary or permanent residence." N.C. Gen. Stat. § 14-51.2(a)(1) (2017) (emphasis supplied).
The pattern instruction for the defense of habitation does not define the term "home." Footnote 1 of the pattern instruction references State v. Blue , 356 N.C. 79, 565 S.E.2d 133 (2002), for the principle that the
defense of habitation can be applicable to the porch of a dwelling under certain circumstances and that the question of whether a porch, garage, or other appurtenance attached to a dwelling is within the home ... for purposes of N.C. Gen. Stat. § 14-51.1 is a question best left to the jury.
N.C.P.I. Crim.-308.80, fn. 1 (2012).
N.C. Gen. Stat. § 14-51.1, referenced above, was the former defense of habitation statute, which was repealed upon the enactment of N.C. Gen. Stat. § 14-51.2. 2011 Sess. Laws 268, § 2. The now-repealed N.C. Gen. Stat. § 14-51.1 did not provide a definition for "home." N.C.P.I. Crim. 308.80's reference to State v. Blue , which interpreted a now-repealed statute, limited the reach and boundaries of "home."
Furthermore, the absence of any definition of "home" to correctly reflect the now-controlling definition in N.C. Gen. Stat. § 14-51.2(a)(1), which expands the definition and incorporates "curtilage" as part of the "home," is potentially prejudicial to a defendant. The term "curtilage" is not defined within N.C. Gen. Stat. § 14-51.2, but in other contexts, "curtilage" has been construed to mean "at least the yard around the dwelling house as well as the area occupied by barns, cribs, and other outbuildings." State v. Frizzelle , 243 N.C. 49, 51, 89 S.E.2d 725, 726 (1955).
A jury instruction given at a trial, based upon the current pattern instruction, could lead a jury to believe defense of habitation is only appropriate when an intruder has entered, or was attempting to enter a physical house or structure, and not the curtilage or other statutorily defined and included areas.
In the instant case, the trial court failed to provide a definition for "home" in the jury instructions. While not argued, a discrepancy exists between N.C.P.I. Crim. 308.80 and the controlling N.C. Gen. Stat. § 14-51.2. The jury could have potentially believed that Defendant could only have exercised his right of self-defense and to defend his habitation only if Thomas was attempting to enter the physical confines of Defendant's house, and not the curtilage or other areas.
*269 The absence of a definition for "home" or "curtilage" in the pattern instruction, and the reference to State v. Blue and the now repealed statute, is not consistent with the current statute. The pattern instruction should be reviewed and updated to reflect *45 the formal and expanded definition of "home" as is now required by N.C. Gen. Stat. § 14-51.2.
V. Conclusion
The prosecutor's argument that Defendant shot Thomas because he was black is not supported by any admitted evidence and is wholly gratuitous and inflammatory.
The prosecutor's argument was an improper and prejudicial appeal to race and the jurors' "sense of passion and prejudice." See Jones , 355 N.C. at 132, 558 S.E.2d at 107 ; see also McCleskey , 481 U.S. at 309 n.30, 107 S.Ct. at 1776 n.30, 95 L.Ed.2d at 289 n.30 ; Williams , 339 N.C. at 24, 452 S.E.2d at 259.
The trial court prejudicially erred by overruling Defendant's repeated objections and by failing to strike the prosecutor's inflammatory and improper statements. We vacate Defendant's conviction and the trial court's judgment, and remand for a new trial with proper instructions. It is so ordered .
NEW TRIAL.
Judge STROUD concurs.
Judge ARROWOOD dissents in a separate opinion.