IN THE SUPREME COURT OF NORTH CAROLINA

No.195A19

Filed 3 April 2020

STATE OF NORTH CAROLINA

v.

CHAD CAMERON COPLEY

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 828 S.E.2d 35 (2019), vacating the judgment entered on 23 February 2018 by Judge Michael J. O'Foghludha in Superior Court, Wake County, and remanding for a new trial. Heard in the Supreme Court on 9 December 2019.

*Attorney General Joshua H. Stein, by Assistant Attorney General Joseph L. Hyde, for the State.*

*Massengale & Ozer, by Marilyn G. Ozer, for defendant.*

HUDSON, Justice.

Here we must determine whether the Court of Appeals erred by holding that the trial court abused its discretion when it overruled defendant's objections during the prosecutor's closing argument. Because we conclude that the trial court rulings did not constitute prejudicial error, we reverse and remand.

I.     Factual and Procedural Background

On 6 August 2016, Jalen Lewis threw a party while his parents were out of town. Lewis lived in Neuse Crossing, a quiet neighborhood in Raleigh with no

sidewalks. Defendant lived on the same street, two or three houses down on the same side of the road.

Around midnight, the victim, Kourey Thomas, arrived at Lewis's party with two friends, David Walker and Chris Malone, and parked at the end of the street. Thomas was wearing a red NC State hat and a red shirt.

Some time later, a group of about twenty people arrived at the party. The hosts did not know them and asked them to leave. The group walked uneventfully back to their cars which were parked in front of defendant's house. They stood on the curb discussing where to go next. According to the State's witnesses, no one was being loud or disruptive.

Defendant testified that he was upset from having a bad day. He heard people arguing outside and yelled at them from his window. He yelled, "keep it the f--- down." The group yelled back, "shut the f--- up; f--- you; go inside, white boy." Defendant testified that he saw multiple people in the group with guns. Other witnesses testified that they did not see anyone with a gun at the party. Defendant's two young daughters were in the house.

Defendant called 911. Before the operator answered, defendant was recorded saying "I'm going to kill him." In his testimony, defendant admitted to having falsely reported there were "hoodlums racing up and down the street." He said he was "locked and loaded" and going to "secure the neighborhood." Defendant was not a police officer

and there was no neighborhood watch. After the 911 call ended, defendant loaded his gun.

Defendant believed his son was part of the rowdy group outside and went to get him. When he got to his garage, which was furnished like a den, he found his son there. From his garage defendant yelled at the group to "leave the premises."

According to witnesses who were at the scene that night, Kourey Thomas and his friends saw police blue lights from an unrelated traffic stop down the street. Thomas had a weed grinder on his person and did not want any trouble with the police, so he ran from Lewis's house back to his friend's car.[1] He cut across a small part of defendant's yard on the way. Defendant saw a man running in his yard. Thomas was shot before he made it to his car. The force from the shot caused him to fall on the curb next to defendant's mailbox. Someone screamed, "he just shot him through the window!" Defendant's house was dark, his garage was closed, and one of the garage windows was broken. Thomas was African American. Defendant is white.

When Deputy Barry Carroll arrived, he saw a group of ten to fifteen people in the street. He saw broken glass in defendant's driveway from the broken garage door window. When the deputy approached the house, he shined a flashlight into the garage and saw defendant step into the garage from the house. The deputy asked defendant if he shot someone and defendant said he had. The deputy asked where

---

[1] A weed grinder is a hand-held device used to grind cannabis into small bits.

the gun was, and defendant indicated that it was in the house. Defendant let the deputy into his house where the deputy observed a shotgun leaning against a stairwell banister. Defendant indicated it that was the gun he had fired.

Thomas died at the hospital from the gunshot wound. The bullet went through his right arm and entered his right side just below the rib cage.

Defendant was charged with first-degree murder. His case went to trial in February 2018. During closing arguments at trial, the prosecutor made the following statements which are at issue here:

> MR. LATOUR [prosecutor]: I have at every turn attempted to not make this what this case is about. And at every turn, jury selection, arguments, evidence, closing argument, there's been this undercurrent, right? What's the undercurrent? The undercurrent that the defendant brought up to you in his closing argument is what did he mean by hoodlums? I never told you what he meant by hoodlums. I told you he meant the people outside. They presented the evidence that he's scared of these black males. And let's call it what it is. Let's talk about the elephant in the room.
>
> MR. POLK [defense counsel]: Objection.
>
> THE COURT: Overruled.
>
> MR. LATOUR: Let's talk about the elephant in the room. If they want to go there, consider it. And why is it relevant for you? Because we talked about that self-defense issue, right, and reasonable fear. What is a reasonable fear? You get to determine what's reasonable. Ask yourself if Kourey Thomas and these people outside were a bunch of young, white males walking around wearing N.C. State hats, is he laying dead bleeding in that yard?

> MR. POLK: Objection.
>
> THE COURT: Overruled.
>
> MR. LATOUR: Think about it. I'm not saying that's why he shot him, but it might've been a factor he was considering. You can decide that for yourself. You've heard all the evidence. Is it reasonable that he's afraid of them because they're a black male outside wearing a baseball cap that happens to be red? They want to make it a gang thing. The only evidence in this case about gangs is that nobody knows if anybody was in a gang. That's the evidence. They can paint it however they want to paint it, but you all swore and raised your hand when I asked you in jury selection if you would decide this case based on the evidence that you hear in the case, and that's the evidence. Now, reasonableness and that fear, a fear based out of hatred or a fear based out of race is not a reasonable fear, I would submit to you. That's just hatred. And I'm not saying that's what it is here, but you can consider that. And if that's what you think it was, then maybe it's not a reasonable fear.

The prosecutor continued his closing argument for several more minutes and then the trial judge instructed the jury on the applicable law.

In less than two hours the jury found defendant guilty of first-degree murder by premeditation and deliberation and/or by lying in wait. Defendant appealed his conviction.

Defendant argued that the trial court abused its discretion by failing to sustain his objections to the prosecutor's comments about race during closing argument. The Court of Appeals held that the trial court committed prejudicial error by overruling defendant's objections and by failing to instruct the jury to disregard the prosecutor's

comments or to declare a mistrial. The Court of Appeals awarded defendant a new trial. The dissenting judge would have held that the trial court did not abuse its discretion in overruling defendant's objections to the prosecutor's comments in closing argument.

The State now appeals. The issue before us is whether the trial court abused its discretion by overruling defendant's objections to the State's closing argument. We hold that the trial court did not commit prejudicial error and that the Court of Appeals erred by awarding defendant a new trial.

## II.    Analysis

"A challenge to the trial court's failure to sustain a defendant's objection to a comment made during the State's closing argument is reviewed for an abuse of discretion . . . ." *State v. Fletcher*, 370 N.C. 313, 320, 807 S.E.2d 528, 534 (2017) (citing *State v. Walters*, 357 N.C. 68, 101, 588 S.E.2d 344, 364, *cert. denied*, 540 U.S. 971, 124 S.Ct. 442, 157 L.Ed. 2d 320 (2003)). "In order to assess whether a trial court has abused its discretion when deciding a particular matter, this Court must determine if the ruling 'could not have been the result of a reasoned decision.' " *State v. Jones,* 355 N.C. 117, 131, 558 S.E.2d 97, 106 (2002) (quoting *State v. Burrus,* 344 N.C. 79, 90, 472 S.E.2d 867, 875 (1996)).

We conduct a two-part analysis to determine whether the trial court committed prejudicial error in overruling defendant's timely objection to the prosecutor's

reference to race during the State's closing argument. *See, e.g.*, *Fletcher*, 370 N.C. at 320, 807 S.E.2d at 534; *Jones*, 355 N.C. at 131, 558 S.E.2d at 106. We "'first determine if the remarks were improper' and then 'determine if the remarks were of such a magnitude that their inclusion prejudiced [the] defendant.'" *Fletcher*, 370 N.C. at 320, 807 S.E.2d at 534 (quoting *Walters*, 357 N.C. at 101, 588 S.E.2d at 364) (alteration in original). "Assuming that the trial court's refusal to sustain the defendant's objection was erroneous, the defendant must show that there is a reasonable possibility that the jury would have acquitted him had the challenged argument not been permitted." *Fletcher*, 370 N.C. at 320, 807 S.E.2d at 534 (citing *State v. Ratliff*, 341 N.C. 610, 617, 461 S.E.2d 325, 329 (1995)).

Here, we need not conduct the two-part analysis in its entirety. Because we determine that the analysis of prejudice is ultimately dispositive, we focus our attention there. *See State v. Murrell*, 362 N.C. 375, 392, 665 S.E.2d 61, 73 (2008) ("Even assuming, *arguendo*, the impropriety of the prosecutor's reference to Dr. Kramer, defendant has failed to demonstrate prejudice."). *See also State v. Peterson*, 361 N.C. 587, 606–07, 652 S.E.2d 216, 229 (2007) ("Because we assume the argument was improper, we must determine whether the argument prejudiced defendant to the degree that he is entitled to a new trial.").[2] Thus, we assume without deciding that the prosecutor's comments about race were improper.

---

[2] In *Peterson*, the State conceded that the Assistant District Attorney's arguments were "excessive and inappropriate." 361 N.C. at 607, 652 S.E.2d at 229. Thus, the Court

Neither the majority nor the dissenting opinion from the Court of Appeals conducted a complete prejudice analysis. The majority held that the trial court committed prejudicial error by overruling defendant's objections and by failing to instruct the jury to disregard the prosecutor's comments or to declare a mistrial. On that basis, the majority awarded defendant a new trial. The dissenting judge disagreed and would have held that the trial court did not abuse its discretion in overruling defendant's objections to the prosecutor's comments in closing argument; thus, there was no need to address the prejudice issue in the dissent.

The Court of Appeals majority stated the proper standard for review of the closing argument and employed the two-part analysis. However, the prejudice analysis was incomplete. The majority concluded that "[t]he offensive nature of the prosecutor's comments exceeded language that our Supreme Court in *Jones* noted was held to be prejudicial error warranting new trials in past cases." *State v. Copley,* 828 S.E.2d 35, 43 (N.C. Ct. App. 2019).

We conclude that *Jones* did not provide an adequate basis for the Court of Appeals' decision on the prejudice issue. Because the challenged argument in *Jones* took place during the State's closing arguments in the sentencing phase of a death penalty case, we consider it inapposite. In *Jones*, we emphasized:

> in determining prejudice in a capital case, such as the one

---

assumed the statements were improper. *Id.* Here, although the State has not conceded the statements were improper, the prejudice prong is still dispositive.

> before us, special attention must be focused on the particular state of the trial. Improper argument at the guilt-innocence phase . . . may not be prejudicial where the evidence of defendant's guilt is virtually uncontested. However, at the sentencing proceeding, a similar argument may in many instances prove prejudicial by its tendency to influence the jury's decision to recommend life imprisonment or death.

355 N.C. at 134, 555 S.E.2d at 108. Here, in the guilt-innocence phase of a non-capital trial, the court must look to the evidence of defendant's guilt as well as to the remainder of the closing argument to determine whether the argument was prejudicial. The context of the argument in *Jones* differs so significantly from the context in which the argument here was made that we conclude it was an improper anchor for the prejudice analysis conducted by the majority below.

The majority below also references the cases we cited in *Jones* as examples of prejudicial closing argument language that we have held warranted new trials in the past. We are not persuaded by the logic of the majority's conclusion that the prosecutor here "exceeded" language we have found to be prejudicial in past cases. The specific language held to have been prejudicial in prior cases does not necessarily define prejudice in the case before us.

We recognize that in *Jones* we did look to language deemed prejudicial in other cases to determine whether the language in *Jones* was prejudicial. In the sentencing phase of a death penalty case, where the jury must determine whether to sentence a defendant to life or death, it may be more appropriate to look to language from other

cases. Because the sentencing issues in one capital case may be similar to the sentencing issues in other capital cases, prior determinations of prejudice may be more informative by comparison than they are to the issues here.

However, when analyzing prejudice in the guilt-innocence phase of this trial, we view prejudicial comments from other cases as having less bearing on our prejudice analysis than a comparison with the evidence and context here. Prejudice is not a quantifiable commodity; statements cannot be assigned a number on a scale from which we can determine whether one statement here is more or less prejudicial than one in another case. Rather, the purpose of a prejudice analysis is to determine whether there is a reasonable possibility that the jury would have acquitted defendant had his objection to the State's argument been sustained. It is defendant's burden to show this. *Fletcher*, 370 N.C. at 320, 807 S.E.2d at 534 (citing *Ratliff*, 341 N.C. at 617, 461 S.E.2d at 329).

The Court of Appeals majority below did not analyze whether defendant carried his burden of showing the likelihood that the jury would have reached a different verdict in light of the evidence and other arguments the jury heard. We conclude that the majority's analysis is inadequate to resolve the issue.

In order to determine whether defendant was prejudiced by the prosecutor's language in closing argument, we assess the likely impact of any improper argument in the context of the entire closing. *State v. Thompson,* 359 N.C. 77, 110, 604 S.E.2d

850, 873 (2004) ("[S]tatements contained in closing arguments to the jury are not to be placed in isolation or taken out of context on appeal. Instead, on appeal we must give consideration to the context in which the remarks were made and the overall factual circumstances to which they referred.") (quoting *State v. Green,* 336 N.C. 142, 188, 443 S.E.2d 14, 41, *cert. denied,* 513 U.S. 1046, 115 S.Ct. 642, 130 L.Ed.2d 547 (1994)), *cert. denied,* 546 U.S. 830, 126 S.Ct. 48, 163 L.Ed.2d 80 (2005)).

The primary dispute at trial was over defendant's intent and the validity of his explanation of events on the fateful evening and his statements to investigators thereafter. Defendant himself admitted statement-by-statement on cross-examination that he had not been truthful with investigators. The prosecutor focused on defendant's admitted false statements to investigators in his closing argument. Looking at the closing argument as a whole, the allegedly improper argument was a small part of the prosecutor's much more extensive argument that defendant was not a credible witness, that the State had proven his guilt beyond a reasonable doubt, and that defendant had not acted in self-defense.

We must also look to the evidence presented by the State to determine whether there is a reasonable possibility the jury would have acquitted defendant if the prosecutor's remarks had been excluded. *See State v. Jones*, 355 N.C. at 134, 558 S.E.2d at 108 ("Improper argument at the guilt-innocence phase . . . may not be prejudicial where the evidence of defendant's guilt is virtually uncontested."); *see also State v. Murillo*, 349 N.C. 573, 606, 509 S.E.2d 752, 771 (1998) ("[E]ven

assuming *arguendo* that this portion of the argument was improper, it was not prejudicial to defendant in light of the substantial evidence of his guilt.") (citing *State v. Campbell,* 340 N.C. 612, 631, 460 S.E.2d 144, 154 (1995), *cert. denied,* 516 U.S. 1128, 116 S.Ct. 946, 133 L.Ed.2d 871 (1996)).

The trial here extended over two full weeks during which time the jury was selected, listened to testimony from numerous witnesses including defendant himself, and received numerous exhibits. Among the exhibits were photographs of the scene, photographs of the victim's body, and the recording of the defendant's voice on the 911 call.

The State presented the following evidence of first-degree murder by premeditation and deliberation and/or by lying in wait: defendant was recorded saying "I'm going to kill him"; defendant told the 911 operator he was "locked and loaded" and was going to "secure the neighborhood"; defendant loaded his gun and went into his dark, closed garage; Thomas ran through a portion of defendant's yard; Thomas was unarmed, non-threatening, and had no interaction with defendant; defendant fired a shot through the closed garage door; defendant admitted to a deputy that he shot someone and that the gun was his; the shot caused Thomas's death. We conclude all of this was compelling evidence of defendant's guilt of first-degree murder and that the credibility of defendant's contention to the contrary—i.e. that he

acted in self-defense—was substantially impaired.[3]

It is then defendant's burden to show that he was prejudiced by the prosecutor's challenged argument. *Fletcher*, 370 N.C. at 320, 807 S.E.2d at 534 (citing *Ratliff*, 341 N.C. at 617, 461 S.E.2d at 329.). But defendant has failed to provide a persuasive argument that there was a reasonable possibility the jury would have acquitted him in the absence of the prosecutor's comments about race.

Given that the jury found beyond a reasonable doubt that defendant was guilty of first-degree murder based on the evidence it heard, and given defendant's failure to argue persuasively that there is a reasonable possibility that the jury would have acquitted him absent the prosecutor's challenged remarks, we cannot conclude that the inclusion of the remarks prejudiced defendant. Therefore, we are unable to conclude that he is entitled to a new trial.

## III. Conclusion

In conclusion, we find that the trial court did not commit prejudicial error by overruling defense counsel's objection during the State's closing argument. Assuming without deciding that the prosecutor's comments about race were improper, we

---

[3] Indeed, the jury convicted defendant of first-degree murder on two theories, premeditation and lying in wait. Although defendant argued to the Court of Appeals that there was insufficient evidence to instruct the jury on the State's theory of lying in wait, this issue is not before us. The dissenting judge would have found that there was sufficient evidence for the jury to convict defendant on the lying in wait theory, but the majority did not reach this issue. On remand, defendant is not precluded from making this argument again.

cannot conclude that defendant was prejudiced, given the context of the challenged argument, and the extensive evidence of defendant's guilt. Accordingly, we reverse the Court of Appeals' decision to award a new trial and remand to the Court of Appeals to rule on defendant's remaining arguments on appeal.

REVERSED AND REMANDED.

Justice EARLS concurring.

The trial court did not abuse its discretion in overruling defense counsel's two objections to the prosecution's statements regarding race and reasonable fear as it relates to defendant's claim of self-defense in this case. I write separately to address the issue that the majority "assumes without deciding" because it is an issue of importance to our criminal justice system, controlled by our precedent and squarely presented by the facts of this case.

We should not assume a statement is improper when the propriety of the statement is the very heart of what matters to the administration of criminal justice and the jurisprudence of this State. The majority below thought the prosecutor's statements were a "prejudicial appeal to race and the jurors' 'sense of passion and prejudice.'" *State v. Copley*, 828 S.E.2d 35, 45 (N.C. Ct. App. 2019) (quoting *State v. Jones*, 355 N.C. 117, 132, 558 S.E.2d 97, 107 (2002)). The dissent concluded the prosecutor's statements were not an appeal to racial animosity. *Id.* at 46 (Arrowood, J., dissenting). We should decide which view is correct under the law of North Carolina.

The essential question is: was it improper, in light of the evidence in this case, for the prosecutor to argue to the jury that a fear based on race would not be a reasonable fear? That argument was proper in this case for two reasons. First, it was not an appeal to racial animosity. Second, statements made by jurors during jury selection, the evidence here concerning race-based statements made by

individuals at the scene, and defendant's assertion of self-defense all combine to suggest that jurors potentially might have been swayed by their own conscious or unconscious racial biases instead of the evidence in the case. In these circumstances the prosecutor properly argued that it would not be reasonable for defendant to fear Kourey Thomas, the victim in this case, if that fear was based on the fact that Kourey Thomas was black.

Explicit appeals by a prosecutor to inflame jurors' racial biases are improper. *State v. Williams,* 339 N.C. 1, 24, 452 S.E.2d 345, 259 (1994) (citing *United States ex rel. Haynes v. McKendrick*, 481 F.2d 152 (2nd Cir. 1973); *State v. Wilson*, 404 So. 2d 968 (La. 1981)). "Official guidelines for prosecutors speak often and decisively against racist appeals. With doctrinal roots in the Constitution and professional ethics, the rule against prosecutorial summoning of 'that thirteenth juror, prejudice' has surfaced in nearly every jurisdiction and has occasioned numerous reversals." Elizabeth L. Earle, Note, *Banishing the Thirteenth Juror: An Approach to the Identification of Prosecutorial Racism*, 92 Colum. L. Rev. 1212, 1213 (1992) (quoting *United States v. Antonelli Fireworks Co.*, 155 F.2d 631, 659 (2d Cir.) (Frank, J., dissenting), *cert. denied*, 329 U.S. 742 (1946)). The archetypal appeal to racial bias involves a prosecutor using racial slurs, invoking race-based stereotypes, and referring to black defendants in derogatory racial terms. *See, e.g., Bennett v. Stirling*, 842 F.3d 319, 324 (4th Cir. 2016) (holding improper appeal to racial prejudice occurred where prosecutor's closing argument in case involving a black defendant

"alternated between characterizing [defendant] as a primitive, subhuman species and a wild, vicious animal"); *Wilson*, 404 So. 2d at 970–71 (reversing first-degree murder convictions where prosecutor's closing argument, including referring to the black defendants as animals, was filled with direct and indirect appeals to the racial prejudices of the all-white jury); *State v. Monday*, 171 Wn.2d 667, 678–81, 257 P.3d 551, 557–58 (2011) (reversing conviction where prosecutor questioned witness credibility by arguing to the jury that "black folk don't testify against black folk").

In *Miller v. North Carolina*, the prosecutor in closing argument "ultimately argued that a defense based on consent was inherently untenable because no white woman would ever consent to having sexual relations with a black." 583 F.2d 701, 704 (4th Cir. 1978). This Court affirmed the convictions on the ground that even if the statement was improper, the error was harmless because the evidence against the defendants was overwhelming. *Id.* at 704–05. Noting that "an appeal to racial prejudice impugns the concept of equal protection of the laws," the Fourth Circuit reversed the convictions, holding that "there was prejudicial error of sufficient magnitude that even after a curative instruction there would remain doubt as to whether the prejudice was removed." *Id.* at 706–07. Whether direct racial slurs, or indirect appeals to racial prejudice, when a prosecutor seeks to invoke a jury's racial biases to obtain a conviction, such statements are improper. *See, e.g.*, *Monday*, 171 Wn.2d at 678, 257 P.3d at 557 ("Like wolves in sheep's clothing, a careful word here and there can trigger racial bias.").

Equally well established is the principle, followed by this Court in *Williams*, that "[n]onderogatory references to race are permissible, however, if material to issues in the trial and sufficiently justified to warrant 'the risks inevitably taken when racial matters are injected into any important decision-making.' " *Williams*, 339 N.C. at 24, 452 S.E.2d at 259, (quoting *McFarland v. Smith*, 611 F.2d 414, 419 (2nd Cir. 1979)). Indeed, courts routinely endorse a prosecutor's statements inquiring of prospective jurors whether they can fairly judge a black defendant in a case involving a white victim without reference to their own racial biases. *See, e.g.*, *Williams*, 339 N.C. at 23–25, 452 S.E.2d at 259–60 (legitimate to make nonderogatory references to race to ensure that racially biased prospective jurors were not seated on the jury); *see also Turner v. Murray,* 476 U.S. 28, 35–36 (1986) (inquiry into racial bias of jurors important because it is possible "for racial prejudice to operate but remain undetected," particularly in capital trials); Debra T. Landis, Annotation, *Prosecutor's Appeal in Criminal Case to Racial, National, or Religious Prejudice as Ground for Mistrial, New Trial, Reversal, or Vacation of Sentence -- Modern Cases*, 70 A.L.R.4th 664 (1991) (collecting cases). *Cf.* Cynthia Lee, *Making Race Salient: Trayvon Martin and Implicit bias in a Not Yet Post-Racial Society*, 91 N.C. L. Rev. 1555, 1563 (2013) (stating that studies indicate "making race salient or calling attention to the operation of racial stereotypes encourages individuals to suppress what would otherwise be automatic, stereotype-congruent responses and instead act in a more egalitarian manner. … [W]hen race is made salient, individuals tend to

treat White and Black defendants the same."); Gary Blasi, *Advocacy Against the Stereotype: Lessons From Cognitive Social Psychology,* 49 UCLA L. Rev. 1241, 1277 (2002) (stating that studies "suggest that there is good reason explicitly to instruct juries in every case, stereotype-salient or not, about the specific potential stereotypes at work in the case").

Also permissible is a prosecutor's argument that the defendant or perpetrator acted out of racial motivations, particularly where a racially-motivated hate crime is at issue but generally in any case where there is some evidence to suggest that race-based animus was a motive or factor in the crime. *See State v. Diehl,* 353 N.C. 433, 436, 545 S.E.2d 185, 187 (2001) ("Although it is improper gratuitously to interject race into a jury argument where race is otherwise irrelevant to the case being tried, argument acknowledging race as a motive or factor in a crime may be entirely appropriate."); *State v. Moose*, 310 N.C. 482, 492, 313 S.E.2d 507, 515 (1984) (white defendant's reference to African-American victim as a "damn nigger," and evidence that victim was driving through a white community, sufficient to support prosecutor's jury argument that murder was, in part, racially motivated).

Therefore, our caselaw has a two-part standard for evaluating the propriety of a prosecutor's statements referencing race. The first part of the inquiry is whether the statements are directly or indirectly an appeal based on derogatory racial stereotypes that seeks to encourage a jury to make a decision based on their own racial biases. If so, the statements are improper.

If the statements are not an appeal to racial animus in some form, blatant or subtle, the second part of the inquiry is whether a neutral or non-derogatory reference to race bears any material relevance to the facts of the case being tried. Such statements may be relevant because of the facts and circumstances of the crime, or because of facts that suggest a racial motivation on the part of the defendant, or both. If a prosecutor's statements are ultimately found to be improper, the question remains whether the error in allowing those statements was harmless.

In addition to cases like *Williams,* where it was held to be permissible for a prosecutor to refer to race when seeking to ensure that jurors will not allow racial biases to infect their consideration of the evidence, an example of a non-derogatory reference to race that is not related to motive but nonetheless permissible is found in *State v. Barden*, 356 N.C. 316, 572 S.E.2d 108 (2002). In *Barden*, this Court held that it was proper for a prosecutor to refer to a victim's race in a non-derogatory fashion during closing argument. We held there that the prosecutor's references to the victim's race and national origin were permissible because they "were not designed to generate an issue of race in the trial. Instead, the prosecutor sought to remind the jury of the victim's humanity and to point out that, despite the victim's unexalted social status and modest economic means, his murder was as consequential as the killing of any other mortal." *Barden*, 356 N.C. at 365, 572 S.E.2d at 139 (citation omitted). *See also State v. Robinson,* 336 N.C. 78, 130, 443 S.E.2d 306, 332 (1994) (permissible for prosecutor in closing to argue that being black and poor was not the

cause of defendant's criminal behavior and should not serve as an excuse). An example of permissible references to race related to defendant's motive is found in *Moose,* where this Court held that the prosecutor's repeated references to the victim as an "old black gentleman" and a "black man" were proper because the evidence was sufficient to raise an inference that his murder was, in part, racially motivated. *Moose,* 310 N.C. at 492, 313 S.E.2d at 515.

The record in this case shows that the prosecutor's references to race in his closing argument were non-derogatory, and that they were intended to ensure that the jury did not allow implicit stereotypes about the dangerousness of young black men to infect their determination of whether defendant established that he had a reasonable fear and acted lawfully in self-defense. In these circumstances, the statements were proper.

The majority details the statements made by the prosecutor that defendant objected to at trial. Those statements do not involve racial slurs nor do they attempt to inflame the jurors' passions or prejudices against black males. Equally, those statements are not derogatory towards white males like defendant in this case. The prosecutor did not use references to animals or animalistic behavior on anyone's part, and, unlike *State v. Jones*, 355 N.C. 117, 558 S.E.2d 97 (2002), relied on by the majority in the Court of Appeals, the prosecutor did not refer to other high-profile cases with analogous facts. The prosecutor did not attempt to link this case to the Trayvon Martin case or any other tragic case involving white men who have killed

unarmed young black men. The prosecutor's argument did not involve derogatory references to race intended to invoke or inflame race-based animus in order to secure a conviction.

The remaining inquiry under our precedents is whether the statements were relevant to the facts of the case. In this case, the prosecutor's statements were relevant because jurors themselves had raised the issue of race during jury selection, defendant testified that the men outside his house had used racially charged language, and defendant asserted self-defense. The very first mention of any race-related aspect of this case came during jury selection when defendant's counsel asked a prospective juror "do you remember anything about comparisons to the famous George Zimmerman case in Florida?" At that point the prosecutor objected and the trial court sustained the objection.

Later during defense counsel's questioning of another prospective juror,[1] the prospective juror remarked that defense counsel had earlier "mentioned Zimmerman" and "the Trayvon Martin situation" and asked if this case involves race, to which defense counsel ambiguously replied "yeah." Defense counsel inquired further as to whether the prospective juror followed the case. When counsel asked what opinions the prospective juror had formed regarding our legal system in the aftermath of that

---

[1] This prospective juror, Mr. Thompson, was later excused by defendant. However, six jurors who did serve on the jury were seated and present at the time of the most extensive discussion.

case, the prosecutor objected and the trial court sustained the objection. Later during voir dire, the same prospective juror again brought up the Trayvon Martin case, its similarity to this case, and his feeling that justice did not prevail in that case. Thus, during jury selection, defense counsel and a prospective juror raised the "elephant in the room" relating to how attitudes about race and self-defense might impact the jury's deliberations in this case.

Defendant testified that after he yelled out his upstairs window to the group below, they yelled back at him, saying "go inside, white boy," and "things of that nature". The defense in this case turned on whether defendant was justified in shooting Kourey Thomas. Therefore, defendant's claim of self-defense required the jury to determine the reasonableness of defendant's fear that his life was in danger. It was proper and permissible for the prosecutor to urge the jury not to allow any racial considerations or stereotypical assumptions about young black men to impact their ultimate decision about what was reasonable fear in these circumstances. Indeed, the prosecutor was trying to make sure the jury would make their decision based only on the evidence in the case.

The prosecutor's statements regarding race in his closing argument were not derogatory. Because the statements were relevant to the evidence in the case and the central issue of self-defense, they were proper. I concur in the majority's conclusion that this matter should be remanded for further consideration of the other

errors raised by defendant that were addressed by the dissent below but not by the majority.