ALLEN, J., dissenting; BROWN, J., concurring in the dissenting opinion.
Verdict of murder in the first degree, and sentence in accordance with law, from which the prisoner appealed.
The prisoner was convicted of murder in the first degree of Dr. E. A. Hennessee, who was killed at Glen Alpine, N.C. just after he stepped off the westbound train, No. 21, about 6:30 p.m., 31 January, 1918, 10 bullets in rapid succession being fired at close range into his back and side — 7 of them passing entirely through his body. At that point the railroad runs east and west, the station being on the south side of the track. The passengers on that night alighted from the train somewhat east of the station in the direction of Morganton. The train was about an hour late. The evening was overcast, it being warm and misty. The train arrived about 6:30 p.m., it being deep twilight. Dr. Hennessee was returning to his home at Glen Alpine from a trip to Greensboro. It seems that he was the first person to alight from the coach in which he was riding. Almost immediately one or more persons in the darkness opened fire upon him. There were 10 or 12 shots in rapid succession. His brother, M. N. Hennessee, who soon arrived on the spot, describes the location of the body as follows: "His body was 8 or 10 feet east of the platform, his head was towards the railroad, lying a little angling, lying nearly straight, with his feet south or southeast, in the direction of W. D. Pitts' store, which is about 60 feet from the railroad track. The head of Dr. Hennessee was something like about three feet from the track. He was lying on his face when I got there."
Dr. T. V. Goode described the wounds as follows: "He was shot 10 times. I don't remember how many went through; think it was five, probably. I'll have to refer to the notes. There were ten wounds, all entered from the back and side. I couldn't tell you how many passed completely through the body. One entered about three inches below the left hip joint in the back of the thigh, ranged downward *Page 846 
and to the right, going through the left thigh at an angle, (787) and through the right thigh, coming out three inches above the right knee cap, and a little to the outside. One entered the left hip four inches behind the joint, towards the median line; didn't come out; I couldn't tell the range of it; one entered four inches towards the median line from that one — that one didn't come out; I couldn't tell the course of that; the next one entered two and a half inches below the crest of the ilium, the hip bone, close to the spine — that didn't come out; that was on the left side; I couldn't tell the course of that; one entered one and a half inches from the spine on the left side, three inches above the angle of the shoulder bone, coming out in front, the left side of the breast bone, at its junction with the first rib. That was all on the left side of the spinal column. On the right side one entered one inch from the spine, two inches above the crest of the ilium, hip bone — that came out in front one and a half inches from the median line, left side, and two inches below the umbilicus (navel), ranging a little bit down; the next one entered four inches below the shoulder, about 5 inches from the spine on the right side, and came out on the left side, ranging almost straight through; the next one entered about the middle axillary line on the right side between the eighth and ninth ribs, ranging probably just a little bit up; next one entered two inches above the angle of the scapula and two inches from the spine, on the right side, and came out the edge of the sternum junction with the second rib, ranging practically straight through; next entered behind the right shoulder, one inch below, came out in front, just below the clavicle, ranging practically straight through." (Witness indicates on body of counsel the location of the wounds).
"I found four of those bullets when I made the examination, and Mr. Hennessee gave me one he had found; that made five that went through. I don't know that there were five that didn't pass entirely through the body; don't know that that is true; some might have been lost that went through. (Witness refers to notes and states that seven went through.) Three did not go through. I found those four that went through lying just inside his shirt; the other Mr. Hennessee said he took out of his tie."
The doctor further stated that practically all the wounds showed more or less powder burns, and that in order to make such burns the pistol would have to be within twenty inches of the victim. The train that night was composed of a combination baggage and passenger car in which the witnesses Ramsey and Amos were sitting, a passenger car immediately behind this, and a chair car at the end.
The conductor, Captain Sumner, was on the front platform of *Page 847 
the combination car, while J. F. Laughter had charge of the passenger coach, under whose supervision the passengers got off and on the train.
It appears from the testimony that Dr. Hennessee was the first passenger to alight from the coach; that he walked (788) around the two or three people waiting to get on the train, and started west towards the platform of the station. As soon as he got clear of this crowd, the man or men waylaying him opened fire upon him.
The State's evidence tended to show that the defendant Wiseman was, if not the sole assassin, certainly one of them. He was recognized by J. M. Ramsey as the man who was standing with two pistols in his hand, one a long, blue steel pistol, in one hand, and a nickel-plated one in the other, and he was emptying these pistols into the body of Hennessee as rapidly as he could pull the trigger. He testified:
"I could see a perfect outline of this man, the coat he had on, the pistols he had in his hands — had a blue pistol in one hand and a nickel-plated one in the other; had on a coat, just like a tan-colored raincoat, tan coat, which I could see very plainly; came between his knees and his shoes, about half way between his knees and the ground." And further on: "I couldn't tell the color of the hat he had on. It was a broad-brimmed hat. I didn't know who the man was at that time. I know now. It was Aaron Wiseman."
Fred Amos also recognized him: "On the 31st of January I was on train No. 21, the same train Mr. Ramsey was on; I was on the left side of the coach, next to the station at Glen Alpine, going west. I was about two or three seats in front of Mr. Ramsey. When the train stopped at the station at Glen Alpine, it hadn't stopped over 30 seconds, and I was attracted by what sounded like fire-crackers or shooting; at the same time cinders hit my window, and I turned in my seat, put my hand up and tried to raise the window at the same time, I couldn't raise it, so I looked out and looked back this way at an angle and I saw a man with two pistols, shooting; one was a light pistol, looked like it was nickel-plated, and the other was a blue steel, I suppose. He was standing looking right down this way, he was slightly bent, and shooting down, looked like, under the train. That man had on a light-colored slouch hat and tan-colored raincoat or slicker of some sore; looked like it struck him below his knees — I didn't pay any great deal of attention to it.
"I know who the man was that I saw doing the shooting; it was Aaron Wiseman; I haven't the least doubt about it in the world; if I had any doubt I certainly wouldn't swear it. This defendant is the *Page 848 
man I saw doing the shooting."
About the accuracy, reliability, and character of these two witnesses nearly all the other testimony in the case clustered: The State on the one hand introducing testimony to corroborate their statements, while the defendant, on the other hand, introduced evidence which tended to disparage and contradict those statements. The issue of facts thus made was passed upon by the jury. This (789) Court reviews only alleged errors of law, or legal inference, committed by the judge, and we need not take time and space to analyze and discuss this testimony, whose admissibility was not excepted to.
The prisoner's first exception is to the order of removal from Burke to Cleveland County. This Court has always held that such order is a matter of discretion, and will not be reviewed unless plainly arbitrary and oppressive, which is not shown in this case. S. v. Hayes Baldwin, ante, p. 687.
Exceptions 2, 3, 4, and 5 are to the admission of testimony in regard to the prisoner's failure to attend court as a witness at the trial of the two Pitts boys for the murder of Hennessee, and that a capias ad testificandum
had been necessary to compel his attendance, and of the service of thatcapias on him by the officers. The Pitts had been tried the year previous for the murder of Dr. Hennessee, and were acquitted. The evidence objected to was competent to show that the prisoner was an unwilling witness at that trial, and, while of little weight in itself, was a circumstance which the State was entitled to have submitted.
Exceptions 6 to 19, inclusive, are to the recital by the court of the contentions of the State, and upon examination we cannot find error therein. It was incumbent upon the prisoner to call any alleged error in such recitals to the attention of the court at the time. S. v. Caylor,ante, p. 807.
Exception 20 is to a paragraph in the judge's charge when, after stating the contentions of the prisoner's counsel, he said: "If you find from the examination of all the evidence in the case that these contentions of the prisoner's counsel are true, you will acquit him." The able and experienced judge, however, both before and after this statement, repeatedly stated to the jury that "the burden was upon the State to satisfy the jury beyond a reasonable doubt." This is often repeated and the jury could not by any possibility have understood this clause as being in any way in conflict with the well settled principle which he so often stated in the charge.
Exceptions 21, 22, and 23 were to the judge's charge defining "lying in wait," which was as follows: "When our statute speaks of *Page 849 
murder perpetrated by lying in wait, it refers to a killing where the person who does the killing has stationed himself for private attack, or one who is lying in ambush for private attack. While being in ambush and concealed, watching and waiting for a victim, would comprehend what is meant by lying in wait, still it is not necessary for the assailant to be actually concealed. If he placed himself in a position so as to make a private attack upon his victim, so as to assail him, under circumstances when the person assailed did not know of his presence, or of his purpose, and in the darkness of the night, or when the ordinary darkness was obscured (790) by clouds and mist, and under such circumstances when he makes a secret assault upon the person assailed and shoots and kills him, and flees without a disclosure of his identity — a killing under these circumstances would constitute a waylaying within the meaning of the statute."
This was in entire accord with all our authorities, S. v. Walker,170 N.C. 716; S. v. Bridges, ante, p. 733. The evidence was uncontradicted that Dr. Hennessee, almost immediately on getting off the train, was fired upon by one or more persons, at short range, all the shots striking him in the back or in the side. The parties were evidently in wait for their victim, and whether one man alone did the firing, and one or two others were present, by a reasonable inference from the evidence, to point him out, or to keep the crowd off till their victim was slaughtered, or whether one man alone did the shooting; in any event, the killing, in any aspect of this case, was an assassination by lying in wait, and by taking the victim unawares without opportunity to defend himself. The chief, if not the only question in the case upon this evidence was as to the identity of the murdered, or murderers, who committed the act, and that was for the jury, upon the evidence, and was fully and earnestly argued to them by the many able counsel who represented the prisoner.
That the slaying was by lying in wait, is beyond question. The only question presented in this record is whether there was legal error committed in the trial, in which the jury found beyond a reasonable doubt the identity of the slayer with the prisoner.
The argument on behalf of the prisoner in this Court was almost entirely expended in urging that upon the evidence the prisoner should not have been convicted, but that is a matter which the jury was to decide, and as to which they were unanimous that there was no reasonable doubt of the guilt of the prisoner. There were two eye-witnesses, who testified that they saw him in the act of shooting Dr. Hennessee, and that there was no doubt of his identity. As to the claim that he could not have gotten on the train after the *Page 850 
shooting, Pink Rabb, a witness for the prisoner, who was stated to be "a highly respectable man," testified that he had known Aaron Wiseman for several years, and that he came into the coach in which Rabb was sitting, who went up and sat down by him and talked to him. Rabb says: "When the came in the firing had ceased."
We do not find the claim that the judge committed errors in reciting the testimony sustained by an examination of the record, but if it had been it was waived by the prisoner, being contented with it at the time, for he made no objection when the judge would have corrected the error, if any, if called to his attention. This (791) has often been held, and has been repeated at this term in S. v. Caylor, ante, p. 807, citing authorities.
The charge of the judge in regard to motive was correct. He said, giving the whole paragraph: "With regard to the question of motive for the commission of crime, the court further instructs you that if the evidence in this case fails to show the prisoner's motive for killing the deceased, this is a circumstance in his favor, which the jury should consider along with the other evidence, but if the jury finds, from all the evidence, direct and circumstantial, that the prisoner committed the crime charged, the jury are at liberty to find the prisoner guilty, whether any motive was apparent or not, because, while motive in the commission of a crime is a material element for a jury in considering it, yet if it is shown beyond a reasonable doubt that the crime was committed, it is not indispensable that the motive should be apparent to sustain a conviction."
In S. v. Adams, 138 N.C. 688, it was held: "The existence of a motive may be evidence to show the degree of the offense, or to establish the identity of the defendant as the slayer, but motive is not an essential element of murder in the first degree, nor is it indispensable to a conviction, even though the evidence is circumstantial," Walker, J., saying (at p. 697): "It is not required that a motive should be shown under the circumstances required in the prayer. When the evidence is circumstantial, the proof of a motive for committing the crime is relevant, and sometimes is important and very potential, as it may carry conviction to the minds of the jurors, when otherwise they would not be convinced. This is all that is meant by the Court in the cases cited by counsel. S. v. Green, 92 N.C. 779. Murder may be committed without any motive. It is the intention deliberately formed, after premeditation, so that it becomes a definite purpose, to kill, and a consequent killing, without legal provocation or excuse, that constitutes murder in the first degree. The existence of a motive may be evidence to show the degree of the offense, or to establish the identity of the defendant as the slayer, *Page 851 
but motive is not an essential element of the crime, nor is it indispensable to a conviction of the person charged with its commission. S.v. Wilcox, 132 N.C. 1143; S. v. Adams, 136 N.C. 620."
Garfield Pitts and Aaron Pitts had been acquitted of the assassination of Dr. Hennessee, and being thus protected, it was perhaps not unnatural that the prisoner on this occasion endeavored to show that they were the guilty men, but the jury believed the testimony of the two eye-witnesses, Ramsey and Amos, who were sitting inside the coach, and by the light thrown from the lamps therein could see the man who was doing the shooting better than those outside in the dark. They testified positively that they saw the prisoner a few feet away when, with a pistol in each hand, he was (792) shooting Dr. Hennessee, and there was also evidence that shots were fired into Hennessee's body after he was lying on the ground. There was evidence introduced by the prisoner tending to show that Garfield Pitts and Aaron Pitts were there at the time, and that after the killing they went over to W. D. Pitts' store. This in nowise contradicts the testimony of Ramsey and Amos that Wiseman was shooting Dr. Hennessee with two pistols, and that they recognized him. The testimony offered by the prisoner shows that the two Pitt boys were there. If they were cooperating with Wiseman in the assassination, and even if they also shot Hennessee when, from their position in the car, the witnesses, Ramsey and Amos, may not have been able to see them, this would in nowise lessen the guilt of the slayer, whom these two witnesses identified as Wiseman, and whom the jury believed.
There was much evidence, besides that offered for the prisoner, that the Pitts boys were present with Wiseman, to show cooperation. Wiseman lived in Avery County, some 30 or 40 miles from the scene of the assassination at Glen Alpine, yet 6 or 8 weeks before the murder of Dr. Hennessee, he was on his way to see W. D. Pitts, and so anxious to see him that night that Loven testified that he told him at Marion that if he missed the train he would hire an automobile. He was at Marion that afternoon just before the killing, with two pistols on his person, one of them large, and the other not so large, corresponding with the description of them by the two witnesses, who saw them in use when he was killing Dr. Hennessee. On his arrival at Glen Alpine he went direct to W. D. Pitts' store, where he got the cartridges. According to the testimony of the prisoner's own witnesses, he was at the place of the assassination that night, accompanied by one or both of the Pitts boys. He claims that after the killing he ran to the end of the train, trying to get on it, and then came back with two drummers to the entrance of the car where the *Page 852 
body was lying, and that he got on the train at the same time they did, but one of these drummers (Stafford) testifies that he did not get on with them. Later, when subpoenaed as a witness for the State at the trial of the Pitts boys, he refused to appear and testified until arrested on a capias. After he was arrested and in jail he told E. A. Green: "I want you to phone for Bud Pitts (W. D. Pitts) to come down here at once," according to Mr. Scott's testimony.
It is not necessary to recapitulate the testimony, for that was a matter for the jury, and was ably presented to them by the numerous, zealous, able, and experienced counsel of the prisoner, one of whom had previously represented the prosecution on the trial of the Pittses, and therefore knew the evidence on both sides (793) thoroughly, and could use it to best advantage.
It might be added that Sam Byrd and Jasper Reap, witnesses for the defendant, testified that they saw two men shooting at Dr. Hennessee on that occasion, but it was so dark that they could not recognize their faces. Byrd says he saw them turn to the body of the man and shoot him after he had fallen, and that one of the men went in the direction of Pitts' store. And he knows that he was one of the men that did the shooting. And he saw another man join him at the store, but he is not certain that he was one of those who fired; that he could not recognize the faces of either of the men. Reap says he did not know who was doing the shooting, but there were two men, and that after the shooting two men went toward Pitts' store. W. A. McSherry testifies that he was in the coach with Ramsey and Amos, but on the north side, and when the firing began he crossed over to the south side and saw one man shooting, with two streams of fire about 12 or 18 inches apart. From where he was in the coach it seems that by the light of the lamps he, like Ramsey and Amos, could see one man shooting distinctly, whereas, the witnesses outside in the dark could not do so. McSherry says that the man doing the shooting wore a tan colored coat.
On an occasion of this kind, when there was great confusion, there would naturally arise some conflict as to details, but in this there is nothing that contradicts the witnesses who say that they recognized the prisoner as the man they saw doing the shooting.
By the light from the car, the three men inside could see, and they testified that they saw distinctly one man in a tan coat firing, and two of them testified positively that the prisoner was that man. From their position they could see, it seems, only one man firing. The witnesses in the dark outside saw evidently objects below the window, shrouded in the darkness, for they did not recognize the faces of the two men whom they saw shooting, as they say, but this *Page 853 
does not tend to contradict the evidence that the prisoner was shooting Hennessee, firing two pistols at close range. He may have had one or more cooperating with him, according to the testimony for the prisoner.
The charge of the experienced and able judge has been closely scanned, and we find it a clear and correct statement of the law applicable, and entirely fair to the prisoner and instructive to the jury in their search for the truth.
The remaining exceptions of the prisoner are to those parts of the charge which instructed the jury that if they were satisfied beyond a reasonable doubt that the prisoner was present, aiding and abetting Garfield Pitts and Aaron Pitts in the assassination of Dr. Hennessee, they should convict him of murder in the first degree.
The instructions to the jury on this point were as follows: "You are further instructed that, although you may (794) find, as has been argued by counsel on both sides, that Garfield and Aaron Pitts assaulted Dr. Hennessee, and participated in the killing of Dr. Hennessee, and were afterwards tried in Burke Superior Court, and acquitted by a jury in Burke County, this would not be a bar to the prosecution of the prisoner in this case. Independent of what was the result of the trial in Burke County in the case of S. v. Garfield Pitts and Aaron Pitts, if the State has furnished you evidence in this case now on trial which convinces you beyond a reasonable doubt that this prisoner waylaid and deliberately shot and killed Dr. Hennessee, either alone or in concert with Garfield Pitts and Aaron Pitts, or both, he would be guilty of murder in the first degree, and you will so find. Or if you find that Garfield Pitts or Aaron Pitts, or both, waylaid and deliberately and with premeditation shot and killed Dr. Hennessee, and you also find beyond a reasonable doubt that the prisoner was present at the time, acting in concert with the person or persons waylaying and deliberately killing Dr. Hennessee, the prisoner, if he so acted in concert, would be guilty of murder in the first degree."
The following is the conclusion of the judge's charge, which evinces a careful and conscientious desire to be fair and just to the prisoner. He said: "It is the duty of the jury to determine carefully, upon all of the evidence as stated by the witnesses, whether the incriminating facts and circumstances from which they may infer guilt are proved beyond a reasonable doubt. The court cannot express an opinion to you as to what weight you shall give to the direct testimony of eye-witnesses, or to the testimony of a witness who testified to the circumstances, or to the testimony of any witness. This devolves on the jury, and they have that sole responsibility to hear *Page 854 
the evidence, consider it, and find the facts from it as it may or may not address itself to their conviction. While the court cannot intimate in the slightest degree what weight you should give to the testimony of any witness, and does not do so, it is proper to call your attention to the fact that in weighing the testimony of a witness the jury has the opportunity to see the witness on the stand, and to observe his demeanor on the stand; in weighing his testimony the jury may also consider his mental capacity to comprehend the facts to which he is testifying, or his lack of mental capacity; also whether he had a good opportunity to observe and to know the particular facts to which he testifies, or the reverse; whether the memory of the witness appears to you to have been good, or the reverse; whether the character of the witness is good or bad; whether the witness is shown to have any motive whatever to misrepresent what he states, or whether he is shown to have been without prejudice or passion. and without private or personal interest to advance; whether (795) his narration of the incidents is consistent with the main facts shown, or is borne out by other circumstances; whether his testimony is supported by concurrent or correlated testimony and circumstances, or whether his testimony is contradicted by other witnesses, or by circumstances shown in the case.
"These cautionary suggestions made to the jury by the court are made only for the purpose of indicating to you some of the elements of probability or improbability as affecting the proof of facts and circumstances, but as I have stated to you, not for the purpose of in anywise intimating to you anything whatever as to the weight which you shall give the testimony of any witness.
"As I have stated to you heretofore, to justify a conviction of the prisoner you must be satisfied of the truth of the charge beyond a reasonable doubt. A reasonable doubt is not a mere whim or surmise, or conjecture, or a capricious speculation, or captious doubt arising from something extraneous to the evidence in the cause, but a reasonable doubt is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the mind of the jury in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge.
"With the instructions given, if you are satisfied beyond a reasonable doubt of the guilt of the prisoner, as contended for by the State, your verdict will be guilty of murder in the first degree, as charged in the bill of indictment. But, on the contrary, if you have a reasonable doubt of the guilt of the prisoner, upon all of the evidence, your verdict will be `not guilty.'"
One of the counsel for the prisoner, in the oral argument in this *Page 855 
Court, suggested that the judge should have submitted to the jury the phase of murder in the second degree. The able and learned counsel for the prisoner took no such exception, and there was nothing to justify it, if it was before us for discussion. There was no question that Dr. Hennessee was shot down in the deepening twilight, just after he had gotten off the train, and was killed by some person or persons the muzzle of whose pistol or pistols were within 20 inches of his body, and that he was shot in the back and side, and in all received 10 bullets in his body. There was no evidence of provocation, or of an altercation, or of self-defense. The whole evidence showed a premeditated assassination by one or more persons. The question before the jury below was almost solely as to the identity of the prisoner as the man who shot him, or who was present, aiding and abetting those who did. It was one of those cases in which there was no doubt as to the manner of the killing, and the court might well have charged the jury, though it did not do so, that "the prisoner was guilty of murder in the first degree or nothing." (796) This would have been strictly in accordance with the testimony, and numerous precedents. S. v. McKinney, 111 N.C. 684;S. v. Cox, 110 N.C. 503; S. v. Byers, 100 N.C. 512; S. v. Jones,93 N.C. 611, and numerous others.
The testimony as to the identity of the prisoner is lengthy, and was ably and fully argued to the jury, who found it sufficient to satisfy them beyond a reasonable doubt that the prisoner was the guilty man. It can serve no purpose to repeat and consider the weight which should be given to the evidence. This was a matter for the jury, and was amply sufficient to be submitted to them, together with the evidence which the prisoner contended should cause them to have a reasonable doubt as to his identity. The argument here for the prisoner was almost entirely that which must have been admitted to the jury, as to whether the evidence should convince them of the identity of the prisoner as the man who slew Dr. Hennessee, or who was present, aiding and abetting those who did. The only evidence excepted to, as above stated was as to the pertinency of the evidence as to procuring the attendance of the prisoner when summoned as a witness on the trial of the two Pittses for the year before for the murder of Dr. Hennessee.
Our province is not to review the evidence and determine how far the jury was warranted thereby in finding beyond a reasonable doubt the identity of the prisoner as charged in the bill of indictment. It is for us to consider only the errors of law assigned, and after a careful consideration we find therein
No error. *Page 856