IN THE SUPREME COURT OF NORTH CAROLINA

No. 195A19-2

Filed 23 May 2024

STATE OF NORTH CAROLINA

v.

CHAD CAMERON COPLEY

On discretionary review pursuant to N.C.G.S. § 7A-31 and on appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 276 N.C. App. 211 (2021), affirming a judgment entered on 23 February 2018 by Judge Michael J. O'Foghludha in Superior Court, Wake County. Heard in the Supreme Court on 14 February 2024.

*Joshua H. Stein, Attorney General, by Benjamin Szany, Assistant Attorney General, for the State-appellee.*

*Marilyn G. Ozer for defendant-appellant.*

EARLS, Justice.

On 6 August 2016, Chad Cameron Copley shot and killed Kourey Thomas as Mr. Thomas cut across the edge of Mr. Copley's front yard. The State charged and a grand jury indicted Mr. Copley for first-degree murder. At trial, he claimed self-defense and defense of habitation. A jury rejected those justifications and convicted him under two theories of murder. On appeal, Mr. Copley argued that the prosecutor impermissibly mentioned race during closing arguments. *See State v. Copley (Copley*

*II)*, 374 N.C. 224, 227 (2020). Mr. Copley is white; Mr. Thomas was black. *Id.* at 226. In impugning Mr. Copley's claim of self-defense, the prosecutor urged that "a fear based out of race is not a reasonable fear . . . . That's just hatred." *See id.* We found no prejudicial error in the prosecutor's remarks and remanded for the Court of Appeals to reach Mr. Copley's remaining claims. *Id.* at 232.

This second appeal stems from that remand. As directed, the Court of Appeals examined Mr. Copley's three outstanding arguments. *State v. Copley (Copley III)*, 276 N.C. App. 211, 212 (2021). It rejected each. *Id.* The court found no gross impropriety in the prosecutor's closing statements on the defense of habitation. *Id.* at 214–16. It saw no reviewable error in the trial court's jury instruction on the aggressor doctrine and habitation defense. *Id.* at 216. And it found no error in the jury instruction on first-degree murder by lying in wait. *Id.* at 218. Mr. Copley challenges each of those rulings. We again find no reversible error and affirm Mr. Copley's conviction.

## I.    Background[1]

### A. The Shooting

In 2016, Mr. Copley lived on Singleleaf Lane, a quiet street in the suburban Neuse Crossing neighborhood. One- and two-story homes line the road. There are no sidewalks. On the evening of 6 August 2016, the street's usual tranquility was broken—first by party noises, then by a gunshot. That night, Jalen Lewis's parents

---

[1] Our first opinion in this case also summarized the factual background. *See Copley II*, 374 N.C. at 225–27. We provide additional facts relevant to the self-defense issues raised in this appeal.

were out of town, and he and his friends decided to throw a party. The Lewises lived a few houses up from Mr. Copley on the same side of the street.

As night fell and the party whirred to life, guests parked their cars up and down Singleleaf Lane, some in front of Mr. Copley's home. Around midnight, Mr. Thomas and two friends arrived at the party. They too parked on the street near Mr. Copley's house and joined the festivities at the Lewis home.

Soon after, a large group of about twenty people arrived at the party. Mr. Lewis had not invited them and wondered if they had gang ties—some wore all red, others all blue. Worried, he asked the group to leave. They agreed and returned to their cars parked in front of Mr. Copley's house.

The group stood on the curb between their cars and Mr. Copley's yard talking about where to go next. It was just after midnight. Mr. Copley—awoken by the noise of the party—leaned out of his upstairs window and yelled, "You guys keep it the f--- down; I'm trying to sleep in here." The group replied, "Shut the f--- up; f--- you; go inside, white boy." Mr. Thomas was not part of this group; at this point, he was still at the party.

At trial, witnesses gave conflicting testimony about guns. Mr. Copley claimed that he saw "firearms in the crowd" and that two people "lifted their shirts up" to flash weapons. Mr. Copley also testified that he was concerned for his family's safety—his wife and children were inside the house. The State's witnesses, on the other hand, testified that they did not see any guns at the party.

After exchanging words with the people outside, Mr. Copley dialed 911. Before the operator picked up but while the call was being recorded, Mr. Copley muttered, "I'm going to kill him." The State presented that recording at trial. In response, Mr. Copley testified that "him" referred to his son, who he thought was at the party. Once connected, Mr. Copley told the 911 operator that "hoodlums" were racing down the street and that the group outside was vandalizing his property. At trial, Mr. Copley admitted that these statements were not true.

Mr. Copley told the operator he was "locked and loaded" and going outside to "secure the neighborhood." He ended the call, grabbed his shotgun, loaded five rounds, and headed to his garage. Mr. Copley found his son there and told him to get a rifle and go upstairs for safety. *Id.* Mr. Copley stayed in the garage, however—the doors were closed and the windows shut.

During these events, Mr. Thomas was still at the Lewis home. He and his friends saw blue police lights from a traffic stop down the street and decided to leave, worried about the marijuana grinder in Mr. Thomas's pocket. The trio hurried towards their car parked at the end of the street.

Mr. Thomas was first. Again, Singleleaf Lane has no sidewalks. As Mr. Thomas ran from the Lewis house, he cut across Mr. Copley's yard near the street curb. A shot rang out. Mr. Thomas spun and fell to the curb next to Mr. Copley's mailbox, screaming "Help. Call 911." Mr. Copley—without warning—had fired through the

window of his dark, closed garage. The bullet tore through Mr. Thomas's right arm and lodged in his right side, just below the rib cage.

Mr. Copley offered his perspective at trial. While in his garage and peering through a window, he testified that people were standing on the lawn near his wife's van. Mr. Copley yelled at them to leave and that police were on their way. Mr. Copley then testified that a young man entered his yard, appearing to move towards the garage. He claimed that the man pulled a gun. In response, Mr. Copley fired a single shot through the window. No weapon was found on Mr. Thomas or at the scene.

At the time of the shooting, Deputy Barry Carroll was just up the street providing backup for the traffic stop. Dispatch reported nearby gunfire and he hurried to the scene. Deputy Carroll saw EMS workers huddled around Mr. Thomas as he lay on the grass near the street curb. The officer also noticed broken glass lying on Mr. Copley's driveway under a broken garage door window. He drew his gun, approached the house, and found Mr. Copley in the garage. The two spoke, and Mr. Copley admitted that he shot a man. He handed over his shotgun and cooperated with officers as they took him into custody.

Meanwhile, EMS rushed Mr. Thomas to a hospital, where he died from the gunshot. He was twenty years old.

## B. Prior Proceedings

On 22 August 2016, a Wake County grand jury indicted Mr. Copley for first-degree murder. His trial began on 12 February 2018. Eleven days later, a jury

convicted Mr. Copley of first-degree murder by premeditation and deliberation, and by lying in wait. The trial court sentenced him to life in prison without parole.

Mr. Copley appealed. He argued that the trial court erred by (1) overruling his objections to the prosecutor's closing remarks about the victim's race, (2) giving the jury erroneous instructions on the defense of habitation, and (3) instructing the jury on homicide by lying in wait. *State v. Copley (Copley I)*, 265 N.C. App. 254, 257 (2019). The Court of Appeals awarded a new trial, holding that the trial court erred in allowing the prosecutor to suggest that the victim's race factored into Mr. Copley's use of deadly force. *See id.* at 255, 257. The court did not reach any other issues. *Id.* at 269. Based on the dissent, *Id.* at 269 (Arrowood, J., dissenting), the State appealed to this Court. We reversed the Court of Appeals and remanded to consider Mr. Copley's remaining claims. *Copley II*, 374 N.C. at 232.

On remand, Mr. Copley argued that the trial court erred by (1) allowing the prosecutor to misstate the defense of habitation during closing argument, (2) erroneously instructing the jury on the aggressor doctrine, and (3) instructing jurors on first-degree murder by lying in wait in a way that distorted his right to defend his home. *Copley III*, 276 N.C. App. at 218.

## C. The Court of Appeals Opinion Under Review

The Court of Appeals examined each of Mr. Copley's claims, and a divided panel found no error. *Copley III*, 276 N.C. App. at 214. First, the court discerned no error in the trial court's failure to intervene during the prosecutor's closing remarks

on the defense of habitation. *Id.* According to the court, the prosecutor did not misstate the law by describing Mr. Copley walking downstairs as "aggressive," because characterizing specific conduct as "aggressive" is not the same as invoking the aggressor doctrine for self-defense purposes. *Id.* at 215–16. In context, too, the challenged statements referred to self-defense, not the defense of habitation. *Id.* at 215. Because there was no gross impropriety in the closing statements, the trial court's failure to intervene was not a reversible oversight. *Id.* at 214.

The court next rejected Mr. Copley's challenge to the jury instruction on the defense of habitation. *Id.* at 216. Since Mr. Copley specifically asked the trial court for extra language on the aggressor doctrine and never objected to the final jury charge, any error was invited by Mr. Copley himself. *Id.* at 217. In all events, the court noted, the trial court correctly instructed on provocation, an exception to the habitation defense. *Id.* at 216. Finally, the court found no error in the instruction on first-degree murder by lying in wait because the evidence, viewed in the light most favorable to the State, supported the requested instruction. *Id.* at 218.

The dissent reached a different conclusion on the lying-in-wait instruction. In its view, the trial court was asked to deliver a self-defense instruction and was thus required to examine the evidence in the light most favorable to Mr. Copley. *Id.* at 218 (Tyson, J., dissenting). From that perspective, the evidence did not support an instruction on murder by lying in wait, as it showed that Mr. Copley was "inside of his home and protecting his family with a shotgun, while facing an armed intruder

after midnight with no response from his 911 call." *Id.* at 227 (Tyson, J., dissenting). Delivering that unsupported instruction to the jury was prejudicial error, the dissent concluded. *Id.* at 227–29 (Tyson, J., dissenting).

Relying on the dissenting opinion, Mr. Copley challenged the Court of Appeals ruling on the murder-by-lying-in-wait instruction. He also sought discretionary review on the trial court's habitation defense instruction and its failure to intervene during closing arguments. We allowed his petition, and now reach and resolve his claims.

## II. Failure to Intervene During Closing Arguments

First, Mr. Copley challenges the trial court's failure to interject during the prosecutor's closing argument. Mr. Copley specifically objects to these statements by the prosecutor:

> [Defense counsel] talked about that home a lot but he didn't talk about his reasonableness very much, and he certainly blew through the section where it talks about there being no other way to escape danger. He doesn't have to retreat from his home, but if you're upstairs and somebody makes a show of force at you, it's not retreating to stay upstairs. It's, in fact, the opposite of that, right? But if you take your loaded shotgun and go down to the garage and if you buy him at his word, which I don't know that you can, you are not retreating. You are being aggressive. You're continuing your aggressive nature in that case.

According to Mr. Copley, the prosecutor impermissibly suggested that he could not invoke the defense of habitation because he was the aggressor. Because that comment misstated the law, he continues, the trial court was duty-bound to step in

and fix the error. It did not. Because of the trial court's silence, Mr. Copley contends, jurors would "necessarily conclude" that he could not invoke the defense of habitation.

Mr. Copley did not object at trial, and so we review for gross impropriety. *See State v. Jones*, 355 N.C. 117, 133 (2002) (citing *State v. Trull*, 349 N.C. 428, 451 (1998), *cert. denied*, 528 U.S. 835 (1999)). The question, then, is whether the closing arguments were so outside "the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made." *Id.* To meet the gross-impropriety standard, a "prosecutor's remarks must be both improper and prejudicial." *Id.*; *see also State v. Huey*, 370 N.C. 174, 180 (2017).

A statement is improper if "calculated to lead the jury astray." *Jones*, 355 N.C. at 133. That is because a "lawyer's function during closing argument is to provide the jury with a summation of the evidence, which in turn serves to sharpen and clarify the issues for resolution by the trier of fact." *Id.* at 127 (cleaned up). Closing remarks must thus "be limited to relevant legal issues," *id.* (cleaned up), and "counsel may not place before the jury incompetent and prejudicial matters," *State v. Rogers*, 355 N.C. 420, 462 (2002) (quoting *State v. Johnson*, 298 N.C. 355, 368–69 (1979)). For that reason, "[i]ncorrect statements of law in closing arguments are improper." *State v. Ratliff*, 341 N.C. 610, 616 (1995). And arguments stray beyond permissible bounds

when lawyers "become abusive, inject their personal experiences, express their personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record." *Huey*, 370 N.C. at 180 (cleaned up).

The prejudice prong looks to whether a prosecutor's remarks were "so overreaching as to shift the focus of the jury from its fact-finding function to relying on its own personal prejudices or passions." *State v. Duke*, 360 N.C. 110, 130 (2005), *cert. denied*, 549 U.S. 855 (2006). Put differently, the closing comments must have veered far enough into improper terrain "to impede the defendant's right to a fair trial." *Huey*, 370 N.C. at 179; *see also State v. Tucker*, 190 N.C. 708, 714 (1925) ("If verdicts cannot be carried without appealing to prejudice or resorting to unwarranted denunciation, they ought not to be carried at all."). To examine prejudice, we "assess the likely impact of any improper argument in the context of the entire closing." *Copley II*, 374 N.C. at 230. Rather than atomizing statements and wrenching them from their surroundings, we consult the setting "in which the remarks were made" and the "overall factual circumstances to which they referred." *State v. Thompson*, 359 N.C. 77, 110 (2004) (cleaned up).

Applied here, Mr. Copley does not show gross impropriety because the prosecutor's closing argument did not clearly misstate the law. As the Court of Appeals reasoned, the prosecutor—in context—appeared to address Mr. Copley's generalized assertion of self-defense, not the defense of habitation. Even if Mr. Copley

is correct that the prosecutor invoked the aggressor doctrine, we have routinely and recently applied that principle to claims of self-defense. *See, e.g., State v. Hicks*, 385 N.C. 52 (2023). But Mr. Copley is not correct—the prosecutor never labeled him the "aggressor" for purposes of self-defense, but instead characterized discrete actions as "aggressive." Though the prosecutor could have chosen his words with more precision, labelling specific conduct as "aggressive" is not a pat invocation of the aggressor doctrine. *See State v. Bass*, 371 N.C. 535, 544 (2018). Key too, the closing remarks did not dilute Mr. Copley's right to defend his dwelling from unlawful entry. The prosecutor correctly explained that Mr. Copley "doesn't have to retreat from his home," before noting that "it's not retreating to stay upstairs." In context, then, the prosecutor merely observed that Mr. Copley intentionally placed himself closer to the action. So despite Mr. Copley's arguments, the challenged statements did not invoke the aggressor doctrine, saddle Mr. Copley with a duty to retreat in his home, or disclaim his right to lawfully defend his dwelling.

Because Mr. Copley has not identified an improper statement in the prosecutor's closing argument, he falters at the first step of the gross-impropriety standard. We need not reach the question of prejudice to find that, on these facts, the trial court did not err by failing to intervene *ex mero motu*. *See Huey*, 370 N.C. at 179 ("Only when it finds both an improper argument *and* prejudice will this Court conclude that the error merits appropriate relief." (emphasis added)).

### III.    Jury Instructions

Mr. Copley next challenges the jury instructions on defense of habitation and first-degree murder by lying in wait. In his view, both instructions misstated the law and distorted his right to defend himself and his home. We examine de novo "whether a jury instruction correctly explains the law." *State v. Greenfield*, 375 N.C. 434, 440 (2020) (cleaned up). On de novo review, we consider "the issue with fresh eyes and may freely substitute our judgment" for the lower courts'. *State v. Woolard*, 385 N.C. 560, 570 (2023) (cleaned up).

#### A. Aggressor Instruction

Mr. Copley first argues that the trial court erred by instructing jurors that the defense of habitation is unavailable to an aggressor. That argument is misguided on the facts and the law.

During the charge conference, the trial court decided to read Pattern Jury Instruction 308.80 on the defense of habitation, including footnote 4 which deals with provocation. Drawn from N.C.G.S. § 14-51.4(2), that footnote explains that a defendant cannot invoke the habitation defense if he first provoked the use of force against himself. In full, the trial court instructed:

> The defendant is justified in using deadly force in this matter if, and there are four things. Number one, such force was being used to prevent the forcible entry into the defendant's home, and, two, the defendant reasonably believed that the intruder would kill or inflict serious bodily harm to the defendant or others in the home, or intended to commit a felony in the home, and, three, the defendant reasonably believed that the degree of force the

-12-

defendant used was necessary to prevent a forcible entry into the defendant's home, and, four, the defendant did not initially provoke the use of force against himself, or if the defendant did provoke the use of force, the force used by the person provoked was so serious that the defendant reasonably believed that he was in imminent danger of death or serious bodily harm, and the use of force likely to cause death or serious bodily harm to the person who was provoked was the only way to escape the danger.

When the trial court included the provocation exception in its instruction on the habitation defense, Mr. Copley's counsel did not object. Far from it—he urged the court to add extra language on the aggressor doctrine into its instructions: "We would ask if the jury is going to be given instruction on provocation, that they be informed on the law of initiation aggression which is intended and designed to calculate this inspiring a fight[.]" The trial court agreed. At Mr. Copley's request, the *self-defense* instruction included specific language on the aggressor doctrine.[2] The *defense of habitation* instruction included the substance of footnote 4—the court did not tell jurors that the habitation defense was unavailable to an "aggressor," as Mr. Copley contends. Nor did Mr. Copley object to either instruction—not at the charge conference, not during the jury charge, and not after the trial court delivered the instructions.

---

[2] On self-defense, the trial court instructed jurors: "If the State fails to prove that the defendant did not act in self-defense or was the aggressor with intent to kill or to inflict serious bodily harm, you may not convict the defendant of either first- or second-degree murder. However, you may convict the defendant of voluntary manslaughter if the State proves the defendant was the aggressor without murderous intent in provoking the fight in which the deceased was killed, or that the defendant used excessive force."

Because Mr. Copley specifically and expressly asked for the "aggressor" language he now attacks, any flaw was of his own device. We discern no reversible prejudice in the "jury instruction given in response to [Mr. Copley's] own request," and decline to award relief for an error so patently invited by Mr. Copley himself. *See State v. McPhail*, 329 N.C. 636, 643 (1991); *State v. Wilkinson*, 344 N.C. 198, 214 (1996) ("Since defendant asked for the exact instruction that he now contends was prejudicial, any error was invited error." (cleaned up)).

## B. First-Degree Murder by Lying in Wait

Finally, Mr. Copley challenges the jury instruction on first-degree murder by lying in wait. He argues that the trial court's instruction failed to properly reflect his right to defend the home, a right enshrined in N.C.G.S. § 14-51.2. That provision—the statutory incarnation of the castle doctrine—allows the lawful occupant of a dwelling to defend it from a trespasser's unlawful or forcible entry. When the statute controls and the State does not dislodge it, a defendant who uses deadly force to protect the home is excused "from criminal culpability." *State v. Coley*, 375 N.C. 156, 160 (2020). At trial, Mr. Copley invoked the statutory castle doctrine, and the trial court instructed on that defense.

But in Mr. Copley's view, the court did not go far enough. In charging jurors on murder by lying in wait, the court suggested that jurors could convict Mr. Copley of that offense even if they deemed his actions covered by the castle doctrine. That instruction was error, Mr. Copley contends, as it distorted the law and allowed the

jury to attach a "guilty" verdict to justified defensive force. We agree and hold that if an occupant inside his home uses lawful defensive force as permitted by section 14-51.2, the statutory castle doctrine vitiates essential elements of lying in wait and precludes criminal culpability for that offense. The instruction delivered in Mr. Copley's case mistakenly suggested otherwise.

Lying in wait is a species of first-degree murder derived from the common law. *See* N.C.G.S. § 14-17(a) (2023); *State v. Leroux*, 326 N.C. 368, 375 (1990). It denotes a precise "method employed to kill," *State v. Baldwin*, 330 N.C. 446, 462 (1992), one typified by "waiting, watching, and secrecy," *State v. Gause,* 227 N.C. 26, 29 (1946). A person lies in wait by "plac[ing] himself in a position to make a private attack," and then striking "when the victim does not know of the assassin's presence" or lethal purpose. *Leroux*, 326 N.C. at 375 (quoting *State v. Allison*, 298 N.C. 135, 147 (1979)). At its core, then, the crime entails "some sort of ambush and surprise of the victim." *State v. Lynch*, 327 N.C. 210, 217 (1990).

But lying in wait does not require a "specific intent to kill" or premeditation and deliberation. *Lynch*, 327 N.C. at 217. The act instead "speaks for itself." *Allison*, 298 N.C. at 149 (quoting *State v. Dunheen*, 224 N.C. 738, 740 (1944)). By concealing his presence or purpose, the assailant betrays the "actual intent to participate in conduct that results in a homicide." *State v. Jones*, 353 N.C. 159, 166 (2000). And because of that subterfuge, the victim—perched in "the most opportune place for annihilation" and yet "unaware of the threat"—has no chance to flee, fight, or plead

for his life. *See State v. Brown*, 320 N.C. 179, 232 (1987). That is why lying in wait murder is uniquely "heinous" and punishable as first-degree murder. *State v. Davis*, 305 N.C. 400, 422 (1982).

In most cases, the crime is not location specific. A person may "lie in wait in a crowd as well as behind a log or a hedge." *Allison*, 298 N.C. at 148. So too on a golf course, *Leroux*, 326 N.C. 368, in a nightclub, *State v. Hamlet,* 312 N.C. 162 (1984), and at a train station, *State v. Wiseman,* 178 N.C. 785 (1919). In each of those settings, the assailant launched a private attack "without any warning of his presence" or purpose. *State v. Bridges*, 178 N.C. 733, 738 (1919). The site of the killings did not change the bottom line: Each victim had no reason to suspect the "impending assault." *See Brown*, 320 N.C. at 190.

But things change at the home's front steps. When a person inside their dwelling uses lawful force to fend off another's illicit invasion, the setting makes all the difference. After all, the home is a special place with special rules. The "sanctity" of a dwelling is a "revered tenet of Anglo-American jurisprudence." *Brown*, 320 N.C. at 231; *see also State v. Sparrow*, 276 N.C. 499, 512 (1970) (grounding "the constitutional principle that a person's home is his castle" in "the ancient rules of the common law"). This Court has agreed. The home, we have explained, is an "especially private place" where "a person has a right to feel secure." *Brown*, 320 N.C. at 231. And "the special status" of that space vests its lawful occupants with "the right to defend it." *Id.* That principle—called the castle doctrine—draws its name from its

canonical formulation: "A man's house, however humble, is his castle, and his castle he is entitled to protect against invasion." *State v. Gray*, 162 N.C. 608, 613 (1913) (cleaned up). Thus, "when a person who is free from fault in bringing on a difficulty[ ] is attacked in his own home or on his own premises, the law imposes on him no duty to retreat before he can justify his fighting in self defense, regardless of the character of the assault." *State v. Johnson*, 261 N.C. 727, 729 (1964). In those circumstances, the castle doctrine allows the occupant "to repel force with force, and to increase his force, so as not only to resist, but also to overcome the assault and secure himself from all harm." *Id.* at 730; *accord State v. Bryson*, 200 N.C. 50, 52 (1930) ("The defendant being in his own home and acting in defense of himself, his family and his habitation—the deceased having called him from his sleep in the middle of the night—was not required to retreat regardless of the character of the assault.").

Today, the castle doctrine is codified in section 14-51.2. To protect the home's sanctity, the statute uses "a burden-shifting provision, creating a presumption in favor of the defendant" that the State may rebut. *See State v. Austin*, 279 N.C. App. 377, 384 (2021). On the front-end, a trespasser "who unlawfully and by force enters or attempts to enter a person's home" is "presumed to be doing so with the intent to commit an unlawful act involving force or violence." N.C.G.S. § 14-51.2(d) (2023). If the lawful occupant of that home knows or has reason to know of the trespasser's invasion, he is presumed to have a "reasonable fear of imminent death or serious bodily harm" to himself or another. N.C.G.S. § 14-51.2(b). Because the occupant is

presumed to reasonably fear death or grave harm, he may repel the trespasser's invasion with deadly force and has no "duty to retreat." N.C.G.S. § 14-51.2(f). In the settings and circumstances embraced by section 14.51.2, then, an occupant's use of deadly force is "justified" and "immune from civil or criminal liability." N.C.G.S. § 14-51.2(e).

Though the castle doctrine enshrines the right to use lawful defensive force, it is not a license to kill. The State may rebut the presumption of reasonableness—and thus an occupant's resort to deadly force—by proving certain facts. For instance, the castle doctrine may not apply if the "person against whom the defensive force is used has the right to be in or is a lawful resident of the home." N.C.G.S. § 14-51.2(c)(1). Moreover, a homeowner could not claim the doctrine's protections if he invites the victim to his house and shoots them as they enter the front gate. So too is the doctrine inapplicable if an occupant "knew or reasonably should have known that the person entering or attempting to enter was a law enforcement officer" in "the lawful performance of his or her official duties." N.C.G.S. § 14-51.2(c)(4). Importantly, section 14-51.2 does not declare open season on Girl Scouts and trick-or-treaters, as "there is an implicit license that typically permits the visitor to approach the home by the front path." *State v. Grice*, 367 N.C. 753, 757 (2015) (cleaned up) (citing *Florida v. Jardines*, 569 U.S. 1, 8 (2013)); *see also id.* at 762 ("The implicit license enjoyed by law enforcement and citizens alike to approach the front doors of homes may be limited or rescinded by clear demonstrations by the homeowners and is already

limited by our social customs."). In some circumstances, then, a person may lie in wait in their own home. *See Bridges*, 178 N.C. at 738 (explaining that defendants who shot police officer lay in wait inside their home by "waiting in the dark for [the officer], as much concealed as if they had been hidden in ambush, prepared to slay without a moment's warning to their victim").

But as Mr. Copley argues, a defendant duly shielded by section 14-15.2 cannot be convicted of first-degree murder by lying in wait because the statutory castle doctrine foreswears the crime's essential elements. For one, a person lawfully inside their home is not an "assassin," "ambush[er]," or "private attack[er]" lying in wait for a victim. *Allison*, 298 N.C. at 147. Those terms—like the crime itself—"impl[y] a hiding or secreting of one's self." *State v. Gause*, 227 N.C. 26, 29 (1946). But there is nothing cloak-and-dagger about a person's lawful presence in their abode. Just the opposite—one within their dwelling is, in fact, precisely where they are expected to be. And once inside their castle, an occupant is entitled to the security and safety of its walls. *See, e.g., State v. Stevenson*, 81 N.C. App. 409, 412 (1986) ("[I]f a person is bound to become a fugitive from her own home, there would be no refuge for her anywhere in the world.").

Lying in wait also involves a fundamentally different type of force than the castle doctrine. As our precedent makes plain, murder by lying in wait entails an offensive attack from an advantaged perch. But the force sanctioned by the castle doctrine is, by its nature, a defensive response to a "reasonable fear of imminent death

or serious bodily harm." N.C.G.S. § 14-51.2(b). Put differently, a person lying in wait *acts* by disguising their presence or purpose and striking their victim "unawares." *Wiseman*, 178 N.C. at 790. But a lawful occupant under the aegis of the castle doctrine reasonably *reacts* to another's unlawful conduct.

Which upends another key facet of lying in wait—unfair "surprise." *See Lynch*, 327 N.C. at 218. When an assailant lies in wait, the victim is clueless "of the impending assault" and "without opportunity to defend himself." *See id.* (quoting *Leroux*, 326 N.C. at 376). Not so when the castle doctrine is in play. Section 14-51.2 presumes that a trespasser breaching the castle walls intends to commit an "unlawful" and "violen[t]" act inside. N.C.G.S. § 14-51.2. Faced with that invasion and the danger it spells, an occupant may use deadly force to defend themselves and their home.

In short, defensive conduct embraced by the castle doctrine is not the sort of underhanded sneak attack typified by lying in wait. When a defendant lawfully defends his home in line with section 14-51.2 and the State does not rebut the statutory presumption of reasonableness, his force is a justified defensive measure immune from criminal culpability. For that reason, section 14-51.2 cannot coexist in the same case with the common-law crime of murder by lying in wait. If the statutory castle doctrine applies, it disclaims the elements of lying in wait and displaces that offense. When the legislature has withdrawn criminal culpability, the common law may not attach it. *See State v. McLymore*, 380 N.C. 185, 190 (2022) ("[T]he General

Assembly possesses the authority to displace the common law through legislative action.").

Measured in that light, Mr. Copley raises valid objections to the trial court's instruction on murder by lying in wait. For that theory of first-degree murder, the trial court explained:

> The defendant has also been charged with first-degree murder perpetrated while lying in wait. For you to find the defendant guilty of this offense, the State must prove three things beyond a reasonable doubt. First, that the defendant lay in wait for the victim; that is, waited and watched for the victim in ambush for a private attack on him. Second, that the defendant intentionally assaulted the victim. And, third, that the defendant's act was a proximate cause of the victim's death . . . . If you find from the facts in this case beyond a reasonable doubt the existence of these three elements listed above on this page, you would also find beyond a reasonable doubt that the defendant did not act in self-defense but acted by lying in wait.

As delivered, the instruction ignored the home's unique status and an occupant's unique right to defend it. The last sentence is particularly troubling. It suggests that the castle doctrine can run in parallel with murder by lying in wait—in other words, that defensive measures sanctioned by section 14-51.2 can, at the same time, qualify as murder by lying in wait. The instruction thus implies that the crime eclipses the castle doctrine—that if Mr. Copley's actions meet the elements of lying in wait, jurors *must* find him guilty, even if they deem the same actions to be lawful defensive force embraced by section 14-51.2.

Therefore, the lying-in-wait instruction was "an inaccurate and misleading

statement of the law." *See State v. Lee*, 370 N.C. 671, 671 (2018). It diluted the castle doctrine's protections and created an undue risk that jurors would convict Mr. Copley for justified defensive force. *See State v. Spruill*, 225 N.C. 356, 358 (1945); *see also State v. Francis*, 252 N.C. 57, 59–60 (1960); *State v. Miller*, 267 N.C. 409, 411–12 (1966). But as this Court has affirmed (and reaffirmed), a "defendant entitled to *any* self-defense instruction is entitled to a *complete* self-defense instruction." *State v. Coley*, 375 N.C. 156, 159 (2020) (quoting *Bass*, 371 N.C. at 542). Because the trial court's lying-in-wait instruction distorted the interplay between the crime and the castle doctrine, it denied Mr. Copley the "full benefit" of the statutory right to defend his home.[3] *See State v. Bost*, 192 N.C. 1, 5–6 (1926).

Under principles of due process, jury instructions infected with legal error often require a new trial. *See McLymore*, 380 N.C. at 198. But Mr. Copley's case is unique. The trial court instructed on two theories of first-degree murder—by premeditation and deliberation, and by lying in wait. The jury found Mr. Copley guilty on both counts and specified the separate convictions on the verdict sheet. By necessity, then, jurors concluded that the castle doctrine did not shield Mr. Copley's actions from criminal liability. *See* N.C.G.S. § 14-51.2(e). Also by necessity, jurors reached that conclusion for each count of first-degree murder—they could not have found Mr. Copley "guilty" otherwise. *See id.* So despite the error in the instruction for

---

[3] Given our holding, we suggest that the North Carolina Pattern Jury Instruction Committee review N.C.P.I.–Crim 206.16 and make appropriate changes in line with this opinion.

murder by lying in wait, Mr. Copley's conviction stands for first-degree premeditated and deliberate murder. For that reason, he does not forecast prejudice warranting a new trial. *See State v. Jenrette*, 236 N.C. App. 616, 638 (2014) (finding no prejudicial error in "jury instruction on lying in wait" because "such error would not have affected [d]efendant's conviction of first-degree murder" under "the theories of premeditation and deliberation and felony murder"); *accord State v. Gosnell*, 231 N.C. App. 106, 113 (2013).

## IV. Conclusion

In sum, we find no gross impropriety in the prosecutor's closing arguments; only invited error in the trial court's instruction on the habitation defense; and no prejudicial error in the instruction on first-degree murder by lying in wait. We thus modify and affirm the Court of Appeals decision and uphold Mr. Copley's conviction.

MODIFIED AND AFFIRMED.

Justice BARRINGER concurring.

On all three issues presented to this Court, the majority reaches the same result as would I. While I agree with the outcome, I write this concurrence to "call out for clarity" in the pattern jury instructions associated with the various self-defense provisions that are now in place. *State v. Hicks*, 385 N.C. 52, 66–67 (2023) (Dietz, J., concurring). Roughly one year ago, this Court was faced with issues of the interplay between the castle doctrine and N.C.G.S. § 14-51.4. *See Hicks*, 385 N.C. 52. It appears that the state of the pattern jury instructions is still not improved as of today.

It is greatly concerning that our State's pattern jury instructions continue to leave jurors confused on what they may or may not consider in self-defense and castle doctrine circumstances. Further development of a strong underpinning to our State's castle doctrine jurisprudence requires clear jury instructions. Instructions that provide jurors with a clear decision tree are critical for a jury to be able to accurately determine whether the presumptions provided by § 14-51.2 have been rebutted. A jury must intentionally and methodically determine whether that presumption has been rebutted. Only a measured determination of rebuttal will clear the path for certain other criminal convictions, such as murder by lying in wait.

For these reasons, I concur with my esteemed colleagues.